**UNIVERSITY OF PITTSBURGH OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION, Petitioner**

v.

**DEPARTMENT OF LABOR & INDUSTRY, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 1, 2006.

Decided April 12, 2006.

Robert L. Byer, Pittsburgh, for petitioner.

James A. Holzman, Deputy Chief Counsel, Harrisburg, for respondent.

John Lucas, Pittsburgh, for intervenor, Earl Glen Whitehead, Jr.

BEFORE: COLINS, President Judge, McGINLEY, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge LEADBETTER.

University of Pittsburgh petitions for review of an order of the Department of Labor and Industry, Bureau of Labor Law Compliance, granting Earl Whitehead's request to inspect his personnel file, including letters that were written by "outside evaluators" in connection with Whitehead's pursuit of a promotion to Full Professor status.[1] The issue raised on appeal is whether these letters are "letters of reference" or "performance evaluations" under the Act commonly referred to as the Personnel Files Act (Act).[2] If the letters constitute letters of reference, then they are not subject to inspection under the Act. On the other hand, if the letters constitute performance evaluations, Whitehead has a right to inspect them. After review, we reverse.

The underlying facts are not disputed. Whitehead is a tenured Associate Professor in the University's Department of Mathematics, specializing in combinatorics and graph theory. In late 2001, Whitehead initiated an application for promotion to Full Professor. The University's procedures for promotion require the assembly of a "dossier" on the promotional candidate, which includes the candidate's *curriculum vitae* (CV), all previous annual faculty reviews, and a minimum of six "external referee" letters.[3] With respect to the ex-

1. The outside evaluators, also referred to throughout the record as "external referees," are not University employees.

2. Act of November 26, 1978, P.L. 1212, *as amended*, 43 P.S. §§ 1321–1324. The Act is also referred to as the Personnel File Inspection Act.

3. Although there are no specific fact-findings regarding the various steps in the promotional process, the University described the pro-

ternal referee letters, the University's procedures provide that the letters should be sought from well-regarded scholars in similar or related fields, or from scholars who know the candidate primarily through their knowledge of his work and impact. Moreover, the candidate is asked to suggest a number of external referees from whom letters are sought but no more than one-half of the letters submitted may be from referees suggested by the candidate.

The University requests the external referees to provide an "evaluation" of the candidate's body of work, and comment on the candidate's accomplishments, assess his stature as a research scholar and teacher, compare him with outstanding persons of comparable rank at other institutions, and comment on whether the applicant would be likely to achieve the full rank of professor at the evaluator's institution.[4] To aid the external referees, the University provides them with ten examples of the candidate's best written work, his CV, a list of research papers and a research statement. The candidate and his department together determine the materials to be submitted to the external referees. The University's procedures provide that promotional decisions are partially based upon the external referees' opinions of the candidate's reputation in his field.

The external referees are not compensated by the University for providing their evaluation. Moreover, only the University employees participating in the promotion process see the external referees' evalua-

cess as first requiring a Departmental level review by a Reading Committee assigned to the case and an anonymous vote by the Department's Full Professors after full discussion and consideration of the candidate's dossier. If two-thirds of the Full Professors vote in favor of promotion, the Department Chair reviews the case and drafts a letter to the Dean of the School of Arts and Sciences, analyzing the case and providing a recommendation for consideration. The Dean's office forms an ad hoc committee to consider the case and further review occurs by the Dean, University Provost and Chancellor.

4. The University's written request to the various external referees generally provided, in pertinent part:

I am writing to ask you to comment on Dr. Whitehead's accomplishments and to give us your assessment of his stature as a research scholar and teacher. It would be particularly helpful if you could compare him with outstanding persons of comparable rank at other institutions and comment on whether he would be likely to achieve the rank of full professor at your own institution. If you can comment on his administrative experience and ability, please do so.

It may be helpful for you to know what the [University] states as criteria for appointment to the rank of Full Professor.

"The rank of professor recognizes the attainment of authoritative knowledge and reputation in a recognized field of learning and the achievement of effective teaching skill. The professor should have attained superior stature in his or her field through research, writing, professional practice, or leadership in professional and learned organizations, as well as having exceeded the standards described for ranks shown above." [cite to University Faculty Handbook omitted].

For your reference and convenience, I have enclosed a package which includes a [CV], a list of research papers, a research statement and copies of the candidate's ten best papers along with his comments. . . . Your letter will be included in the dossier that is made available to the full professors of this department and submitted to the [Faculty of Arts and Sciences] Dean. He will share it only with the members of the *ad hoc* Review Committee and forward it to the Provost and Chancellor along with his recommendation regarding this promotion.

I am aware that this is a demanding request . . . and I thank you in advance for your help. . . . If you have any questions, or if you cannot evaluate Dr. Whitehead's case at this time, please contact me. . . .

R.R. 327–328a (Letter of John Chadham, Chair of the Department).

tions. The identity of the external referees and their evaluations are not revealed to the promotional candidate.

The Full Professors in Whitehead's department failed to recommend him for promotion and, therefore, he was not promoted. Whitehead raised several concerns regarding the review process with the Department's Chair, Dr. John Chadham, and was advised that several external referees responded negatively. Whitehead pursued the matter further and an internal investigation ensued into the selection of the external referees, ultimately concluding that the review process was fair.

Thereafter, in November 2002, Whitehead requested access to his personnel file, including the external referee letters. While the University granted Whitehead access to his file, it denied access to the external referee letters pursuant to a University policy exempting from inspection "external references secured from persons who are not current ... employees and who do not receive an honorarium or fee for submitting the reference." Adjudication No. 2002–28 (June 16, 2005), slip op. at 5, Finding of Fact No. 11. Whitehead then filed a complaint with the Bureau seeking an order permitting him to inspect the external referee letters.[5] Following a hearing, the Bureau concluded that the external referee letters were performance evaluations, not letters of reference, and, therefore, subject to inspection under the Act. In reaching this conclusion, the Bureau examined this court's decisions in *Lafayette College v. Department of Labor and Industry, Bureau of Labor Standards*, 118 Pa.Cmwlth. 11, 546 A.2d 126 (1988), and *Pennsylvania State University*

*v. Department of Labor and Industry, Bureau of Labor Standards (Penn State)*, 113 Pa.Cmwlth.119, 536 A.2d 852 (1988), and the Bureau's earlier adjudication in *Hoagland v. Lehigh University* (Bureau decision dated February 24, 1982). The Bureau concluded that the external referee letters constituted performance evaluations because the letters were a required part of the University's promotion criteria, the decision to promote is partially based upon the letters and the external referees are asked to evaluate the candidate. The Bureau specifically concluded that whether the external referee was required to provide the letter or paid to provide the letter was not dispositive. Accordingly, the Bureau ordered the University to make such documents available for inspection. The order was later stayed pending resolution of the instant appeal.

On appeal, the University contends that the Bureau erred as a matter of law in concluding that the external referee letters constitute performance evaluations subject to inspection under the Act.[6] According to the University, the Bureau's conclusion is not supported by the common usage of the phrase "letter of reference," nor its prior decision in *Hoagland*, which was later adopted and applied in *Penn State* and *Lafayette College*. The University further contends that the Bureau erred in concluding that any letter that evaluates a candidate's ability and/or qualifications and is used in the promotion process constitutes a performance evaluation.

We begin by noting that the Act provides that the employer "shall, at reasonable times, upon request of an employee, permit that employee or an agent designated by the employee to inspect his or

---

5. *See* Section 4 of the Act, 43 P.S. § 1324 (authorizing Bureau upon petition and hearing to, *inter alia*, provide access to records under the Act).

6. Because the sole issue presented here is a question of law, our review is plenary.

her own personnel files used to determine his or her own qualifications for employment, promotion, additional compensation, termination, or disciplinary action." Section 2, 43 P.S. § 1322. A "personnel file" is defined as:

If maintained by the employer, any application for employment, wage or salary information, notices of commendations, warning or discipline, authorization for a deduction or withholding of pay, fringe benefit information, leave records, employment history with the employer, including salary information, job title, dates of changes, retirement record, attendance records and *performance evaluations*. The term "personnel file" shall not include records of an employee relating to the investigation of a possible criminal offense, *letters of reference*, documents which are being developed or prepared for use in civil, criminal or grievance procedures, medical records or materials which are used by the employer to plan for future operations or information available to the employee under the Fair Credit Reporting Act. . . .

Section 1 of the Act, 43 P.S. § 1321 (emphasis added). The Act does not define either "performance evaluation" or "letters of reference."

 This court has previously adopted and applied the guidelines enunciated by the Bureau in *Hoagland* for distin-

guishing between performance evaluations and letters of reference.[7] *See Lafayette College; Penn State.* After a review of these decisions, we conclude that a key factor distinguishing a performance evaluation from a letter of reference is that the author of the writing is under supervision, direction or control of the promotional candidate's employer.

In *Hoagland,* the petitioner, an Assistant Professor seeking tenure, sought to inspect writings issued in conjunction with her candidacy for tenure; the writings at issue were prepared by tenured faculty members of Lehigh University as well as members of an external ad hoc committee appointed to render opinions on the petitioner's scholarship. In seeking to interpret the Act, the hearing examiner devised the following criteria for distinguishing performance evaluations from letters of reference:

[T]he term "performance evaluation", in common usage, connotes some type of report which a designated individual or class of individuals is *required* to complete; whereas, a "letter of reference" is typically a written statement that a person is *requested* to submit on behalf of another individual. A person is not compelled to write a "letter of reference", either by a superior or by a set of rules or procedures, and will usually decline to submit such a letter on behalf of

**7.** As we noted in *Pennsylvania State University v. Department of Labor and Industry, Bureau of Labor Standards (Penn State),* 113 Pa. Cmwlth.119, 536 A.2d 852 (1988):

[W]hen the words of a statute are not explicit, the intention of the legislature may be ascertained by reference to administrative interpretations of that statute. 1 Pa. C.S. § 1921(c)(8). Further, in construing a statute, words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases

and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition. 1 Pa.C.S. § 1903(a).

*Id.* at 854 n. 5. Moreover, it is well-established that the interpretation of a statute by those charged with its execution is entitled to great weight and deference and should not be disregarded or overturned unless it is clear that such construction is clearly erroneous. *Id.* at 855–56.

an undeserving individual rather than prepare a disparaging letter. [I]f a document is to be treated as a "performance evaluation" for purposes of the Personnel Files Act, its contents must have been utilized to determine an employe's "qualifications for employment, promotion, additional compensation, termination or disciplinary action." 43 P.S. § 1322.

*Hoagland,* slip op. at 5 (emphasis in original).

Based upon the above guidelines, the hearing examiner in *Hoagland* concluded that letters written by University faculty members were performance evaluations because the faculty members were employees of the University subject to the University's direction, supervision or control, and the letters were generated in compliance with University procedures, which required faculty participation in tenure decisions. As to the letters issued by the external ad hoc committee, the hearing examiner concluded that they were letters of reference because they were requested from individuals outside the University community, who were not subject to the University's supervision and control and, presumably, had the right or option to decline from serving on the committee. Further, the petitioner had input into the selection of the members of the ad hoc committee and they were not predesignated by a superior or a set of procedures.

Subsequently, in *Penn State,* after the petitioners were denied tenure, they sought to examine tenure reports authored by faculty members serving on peer review committees. The faculty members served on the committees voluntarily, not as a condition of employment, and were advised that their proceedings were confidential. While service on the committee itself was voluntary, once on the committee, the faculty member was required to participate in making a tenure recommendation and the committees were required under the University's regulations to provide evaluations, which were then included in the candidate's dossier. The hearing examiner concluded that, under the *Hoagland* guidelines, the committee reports were performance evaluations subject to inspection.

On appeal, this court referenced the *Hoagland* guidelines and affirmed. In doing so, we concluded that the faculty members' voluntary participation on the committees and lack of supervisory responsibility over the candidates were not dispositive. Rather, we noted that once a member served on a committee, he or she was required to participate in making a tenure recommendation and could not decline to do so. We further noted that the reports were not prepared at the request of the candidate but as a result of the University's tenure procedures and that they were prepared by a designated group of faculty members over which the candidate had no input or control. Finally, we noted that the reports were evaluative in nature, reviewing the candidate's teaching ability, research, scholarly performance, and service to the university, public and profession.

Next, in *Lafayette College,* after a professor was denied tenure, he sought to inspect tenure reports prepared by faculty members of his department as well as reports prepared by scholars of other institutions that evaluated a manuscript that the professor had written. The University paid each external scholar $100–$200 dollars for critiquing and authoring a report regarding the professor's manuscript. Access to both types of reports was denied by the University. Employing the criteria enunciated in *Hoagland,* the hearing examiner concluded that the reports prepared by the faculty members constituted

performance evaluations. In drawing this conclusion, the examiner noted that whether the reports were voluntary or mandatory was not dispositive. Rather, the hearing examiner concluded that the pertinent factor was that the reports were, "evaluations of an employee's work performance submitted by co-workers under the direction, supervision, and control of the employer, and in accordance with the employer's procedures, instructions, and guidelines." 546 A.2d at 130 (quoting hearing examiner's report). As to the external reports, the examiner concluded that they also constituted performance evaluations. In doing so, the examiner distinguished *Hoagland,* noting that unlike that case where the external evaluators were not employed by the university or under its supervision and control, the receipt of compensation in *Lafayette* brought the external scholars under the University's direction, supervision and control. On appeal, we affirmed both conclusions. As to the first category of reports, we concluded that the Bureau's conclusions were consistent with *Penn State.* As to the second category, the external reports, we noted the Bureau's reasons for distinguishing *Hoagland* and agreed with its conclusion.

■■■■ After a review of the above authority, we conclude that in order for a written document to constitute a performance evaluation, it not only needs to evaluate the employee's qualifications and be used to determine qualification for promotion, but it also needs to be authored by one who is under the employer's supervision, direction or control. Otherwise, almost every letter of reference would be deemed to be a performance evaluation

merely because it touched upon the employee's work ability and was considered in evaluating an employee's work status. Here, the external referees were not under the direction and control of the University and they were not compelled or required by any authority to evaluate Whitehead. Accordingly, we conclude that the Bureau erred in concluding that the external referee letters constituted performance evaluations subject to inspection under the Act. In doing so, we note that the facts that the letters were required as part of the promotional process and evaluated Whitehead do not command a different result. While such factors are necessary for a document to constitute a performance evaluation, those factors alone do not convert a letter, voluntarily written by one not under the employer's supervision, direction and control, into a performance evaluation.

Based upon the foregoing, the order of the Bureau granting access to the letters submitted by external referees is reversed.[8]

ORDER

AND NOW, this 12th day of April, 2006, the order of Department of Labor and Industry, Bureau of Labor Law Compliance in the above captioned matter is hereby REVERSED.

DISSENTING OPINION BY Judge McGINLEY.

I respectfully dissent to the majority's conclusion that the letters written by the outside evaluators were "letters of reference" and not "performance evaluations"

8. In light of our resolution of the issue discussed, we need not address the University's argument that the Bureau erred in failing to "adequately consider the policy consider-

ations in favor of giving effect to the Legislature's decision in the Act to shield letters of reference from inspection." University's appellate brief at 3.

under the act commonly referred to as the Personnel Files Act (Act).[1] As the majority states, an employee may inspect a performance evaluation as part of his personnel file but does not have the right to inspect a letter of reference.

The University of Pittsburgh's letter requested:

[The external referees] compare him [Whitehead] with outstanding persons of comparable rank at other institutions and comment on whether he would be likely to achieve the rank of full professor at your institution.... For your reference and convenience, I have enclosed a package which includes a curriculum vitae, a list of research papers, a research statement and copies of the candidate's ten best papers along with his comments. This material was agreed by the Reading Committee and the candidate and provided by him. If you need anything else which you feel is important for this evaluation, please contact me and we will make a copy available.

Letter from John Chadham, Chair, Department of Mathematics to Professor Ron Read at 1; Reproduced Record at 327a.

In addition to the documents listed in the letter, the University of Pittsburgh submitted copies of Earl G. Whitehead, Jr.'s (Whitehead) teaching evaluations with Whitehead's approval and suggested that his instructional materials be submitted to the outside referees.

The referees were asked to evaluate Whitehead in comparison to other scholars in his field to determine whether he deserved to be promoted to full professor. The Department of Labor and Industry, Bureau of Labor Law Compliance (Bureau) found as a fact that the "University's decision to promote is partially based on the external referees' judgment of the candidate's reputation in the field." Adjudication, June 16, 2005, Finding of Fact No. 6 at 4. The Bureau also found that Dr. John Chadham, the Department of Mathematics Chair, advised Whitehead that several of the letters from outside referees provided negative information about Whitehead.

I agree with the Bureau's determination that the external referee letters constituted performance evaluations because they were a required part of the University of Pittsburgh's promotion criteria in that the decision to promote was partially based upon the external referees' evaluations.

In *Pennsylvania State University v. Department of Labor and Industry, Bureau of Labor Standards*, this Court addressed whether a person who had been denied tenure at Pennsylvania State University (Penn State) could examine written reports prepared by faculty members on peer review committees. The Hearing Examiner determined that the peer review committee reports were performance evaluations subject to inspection under the Act. Penn State petitioned for review with this Court and contended that the peer review committee reports were letters of reference not subject to inspection. Penn State based this argument on the fact that the faculty members voluntarily served on the peer review committees and were not required to do so as a condition of employment and that the faculty members on the peer review committee had no supervisory responsibility over the tenure candidates. *Penn State*, 536 A.2d at 853–854.

This Court affirmed:

The peer review committee reports in this case were not prepared at the request of the tenure candidate, but were generated as a result of Petitioner's

---

1. Act of November 26, 1978, P.L. 1212, *as amended*, 43 P.S. §§ 1321–1324. The Act is also referred to as the Personnel Files Inspection Act.

[Penn State] procedures and regulations. The reports were prepared by a designated group of tenured members of Petitioner's [Penn State] faculty over which Respondents had no control or input. Given these considerations, Petitioner's [Penn State] argument that the peer review reports are analogous to letters of reference is without merit.

The fact that the faculty serving on the committees did not possess supervisory authority over the tenure candidates is not dispositive. Rather, the nature of the peer review reports is controlling. Because these reports evaluate tenure candidates in the areas of teaching ability, research, scholarly performance, and service to the university, public, and profession, we agree with the Bureau's determination that these reports constituted performance evaluations. . . .

*Penn State,* 536 A.2d at 855.

Clearly, the present case differs from *Penn State* in that Whitehead had some input into the identity of the external referees and the external referees were not faculty members of the same institution as Whitehead. However, the external referee letters were undeniably evaluations of Whitehead's research, publications, and teaching. These evaluations were critical factors in determining whether Whitehead would become a full professor. I agree with the Bureau that the external referee letters constituted performance evaluations which Whitehead could review. Accordingly, I would affirm.

Judge FRIEDMAN joins this dissenting opinion.