# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania :
Acting by Attorney General, :
Kathleen Kane, :
     Plaintiff :
 :
    v. :
 :
Golden Gate National Senior Care LLC; :
GGNSC Holdings LLC; GGNSC :
Administrative Services LLC; GGNSC :
Clinical Services LLC; GGNSC Equity :
Holdings LLC; GGNSC Harrisburg LP; :
GGNSC Harrisburg GP, LLC; GGNSC :
Camp Hill III LP; GGNSC Camp Hill :
III GP, LLC; GGNSC Clarion LP; :
GGNSC Clarion GP, LLC; GGNSC :
Gettysburg LP; GGNSC Gettysburg GP, :
LLC; GGNSC Altoona Hillview LP; :
GGNSC Altoona Hillview GP, LLC; :
GGNSC Lansdale LP; GGNSC :
Lansdale GP, LLC; GGNSC :
Monroeville LP; GGNSC Monroeville :
GP, LLC; GGNSC Mt. Lebanon LP; :
GGNSC Mt. Lebanon GP, LLC; :
GGNSC Phoenixville II LP; GGNSC :
Phoenixville II GP, LLC; GGNSC :
Philadelphia LP; GGNSC Philadelphia :
GP, LLC; GGNSC Wilkes-Barre II LP; :
GGNSC Wilkes-Barre II GP, LLC; :
GGNSC Tunkhannock LP; GGNSC :
Tunkhannock GP, LLC; GGNSC :
Erie Western Reserve LP; GGNSC :
Erie Western Reserve GP, LLC; :
GGNSC Pottsville LP; GGNSC :
Pottsville GP, LLC, : No. 336 M.D. 2015
     Defendants : Argued: June 8, 2016

BEFORE: HONORABLE MARY HANNAH LEAVITT, President Judge
    HONORABLE RENÉE COHN JUBELIRER, Judge
    HONORABLE ROBERT SIMPSON, Judge
    HONORABLE P. KEVIN BROBSON, Judge
    HONORABLE PATRICIA A. McCULLOUGH, Judge
    HONORABLE ANNE E. COVEY, Judge
    HONORABLE MICHAEL H. WOJCIK, Judge

OPINION BY
JUDGE COVEY                                    FILED: March 22, 2017

Before this Court are Golden Gate National Senior Care, LLC, *et al.*'s (Golden Gate) preliminary objections to the Commonwealth of Pennsylvania's (Commonwealth) Amended Complaint and Petition for Injunctive Relief addressed to this Court's original jurisdiction.[1]

Golden Gate consists of a group of companies that manage and operate 36 skilled nursing facilities (Facilities) in Pennsylvania. GGNSC Holdings LLC, Golden Gate National Senior Care LLC, GGNSC Clinical Services LLC, and GGNSC Administrative Services LLC are described in the pleadings as parent entities (Parent Entities).[2] On July 1, 2015, the Commonwealth, by the Office of Attorney General (OAG), filed a Complaint and Petition for Injunctive Relief (Original Complaint) addressed to this Court's original jurisdiction against 14 of Golden Gate's Pennsylvania Facilities. On August 6, 2015, Golden Gate filed preliminary objections to the Original Complaint setting forth ten objections.

---

[1] A related dispute was before this Court in *GGNSC Clarion LP v. Kane*, 131 A.3d 1062 (Pa. Cmwlth. 2016) (*GGNSC Clarion*). In *GGNSC Clarion*, the petitioners and their affiliated entities are the owners and operators of long-term care facilities, including skilled nursing facilities, who sought declaratory relief contending that, among other things, the Commonwealth's Office of Attorney General (OAG) lacked authority to investigate or pursue litigation concerning staffing levels at skilled nursing facilities since the Health Care Facilities Act, Act of July 19, 1979, P.L. 130, *as amended*, 35 P.S. §§ 448.101-448.904b, vested exclusive jurisdiction in the Department of Health. On January 11, 2016, this Court sustained the OAG's preliminary objections, granted the OAG's motion to dismiss and dismissed petitioners' amended petition for review. On December 28, 2016, the Pennsylvania Supreme Court affirmed this Court's decision. *See GGNSC Clarion LP v. Kane* (Pa. No. 6 MAP 2016, filed December 28, 2016).

[2] Parent Entity Defendants GGNSC Holdings LLC and Golden Gate National Senior Care LLC, indirectly own and operate the Facilities located in Pennsylvania. Parent Entity Defendant GGNSC Administrative Services LLC and Parent Entity Defendant GGNSC Clinical Services LLC exercise operational and management control over the Facilities. Defendant GGNSC Equity Holdings LLC is a general partner in three of the Facilities and holds a controlling ownership interest in the Facilities.

On September 8, 2015, the Commonwealth filed an Amended Complaint and Petition for Injunctive Relief (Amended Complaint), naming an additional 11 of Golden Gate's Pennsylvania Facilities as defendants.[3] Therein, the Commonwealth asserted the following three claims against Golden Gate: (1) Unfair Trade Practices and Consumer Protection Law (UTPCPL)[4] violations (seeking injunctive relief, restoration and civil penalties); (2) breach of contract (seeking damages); and (3) unjust enrichment (seeking disgorgement). The Commonwealth alleged that Golden Gate engaged in unfair and deceptive acts and practices towards Pennsylvania

---

[3] According to the Amended Complaint:

> The [Facilities] located in Pennsylvania include Defendants Golden LivingCenter - Blue Ridge Mountain (Harrisburg, PA); Golden LivingCenter - Camp Hill (Camp Hill, PA); Golden LivingCenter - Clarion (Clarion, PA); Golden LivingCenter - Doylestown (Doylestown, PA); Golden LivingCenter - East Mountain (Wilkes-Barre, PA); Golden LivingCenter - Gettysburg (Gettysburg, PA); Golden LivingCenter - Hillview (Altoona, PA); Golden LivingCenter - Lancaster (Lancaster, PA); Golden LivingCenter – Lansdale (Lansdale, PA); Golden LivingCenter - Mansion (Sunbury, PA); Golden LivingCenter - Monroeville (Monroeville, PA); Golden LivingCenter - Mt. Lebanon (Pittsburgh, PA); Golden LivingCenter - Murrysville (Murrysville, PA); Golden LivingCenter – Phoenixville (Phoenixville, PA); Golden LivingCenter - Reading (Reading, PA); Golden LivingCenter - Rosemont (Rosemont, PA); Golden LivingCenter - Scranton (Scranton, PA); Golden LivingCenter - Shippenville (Shippenville, PA); Golden LivingCenter - Stenton (Philadelphia, PA); Golden LivingCenter - Summit (Wilkes Barre, PA); Golden LivingCenter – Tunkhannock (Tunkhannock, PA); Golden LivingCenter - Uniontown (Uniontown, PA); Golden LivingCenter - Western Reserve (Erie, PA); Golden LivingCenter - West Shore (Camp Hill, PA); and Golden LivìngCenter - York Terrace (Pottsville, PA). . . .

Amended Complaint at 3, ¶ 2. Such Facilities "are licensed by the Department of Health and . . . are certified under the Medicare and Medicaid programs pursuant to Titles XVIII and XIX of the federal Social Security Act, 42 U.S.C. §§ 1395[-1395b-10], and 42 U.S.C. §§ 1396[-1396w-5], administered by the United States Department of Health and Human Services . . . through the Centers for Medicare and Medicaid Services . . . ." *GGNSC Clarion*, 131 A.3d at 1064 n.2.

[4] Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§ 201-1–201-9.3.

3

consumers and the Commonwealth by: (1) making chain-wide misrepresentations in marketing materials; (2) making Facility-level misrepresentations in its marketing materials, resident assessments/care plans and billing statements, presenting misleading appearances during Commonwealth inspections, and creating false records; (3) making misleading statements about the level of care that would be provided to residents; and (4) failing to provide basic care. On October 8, 2015, Golden Gate filed preliminary objections to the Amended Complaint, setting forth twelve objections (Preliminary Objections).

This Court's review of preliminary objections is limited to the pleadings. *Pa. State Lodge, Fraternal Order of Police v. Dep't of Conservation & Natural Res.*, 909 A.2d 413 (Pa. Cmwlth. 2006), *aff'd*, 924 A.2d 1203 (Pa. 2007).

> [This Court is] required to accept as true the well-pled averments set forth in the . . . complaint, and all inferences reasonably deducible therefrom. Moreover, the [C]ourt need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion. In order to sustain preliminary objections, it must appear with certainty that the law will not permit recovery, and, where any doubt exists as to whether the preliminary objections should be sustained, the doubt must be resolved in favor of overruling the preliminary objections.

*Id.* at 415-16 (citations omitted).

## I.     Preliminary Objections 1 and 2

Golden Gate in its Preliminary Objection 1 alleges that the OAG lacks statutory authority to pursue this action because it effectively seeks to regulate skilled nursing facility staffing levels, an area within the Pennsylvania Department of Health's (DOH) exclusive purview. In its Preliminary Objection 2, Golden Gate avers that the Commonwealth is attempting to set new minimum staffing

requirements by "completely bypass[ing] the regulatory procedures in place that govern how changes to laws and regulations are to be made, including the requirements of public notice and the opportunity for [Golden Gate] and other interested parties to be heard on any such changes." Preliminary Objection 2 at 13, ¶ 33.

On March 30, 2016, this Court issued an order, wherein it noted the parties' agreement that Preliminary Objections 1 and 2 were resolved by this Court's opinion in *GGNSC Clarion LP v. Kane*, 131 A.3d 1062 (Pa. Cmwlth. 2016) (*GGNSC Clarion*), which dismissed a declaratory judgment action raising the same issues presented in Preliminary Objections 1 and 2. For the reasons explained therein, Preliminary Objections 1 and 2 are overruled.

## II.     UTPCPL - Preliminary Objections 4, 5, 6, 7, 8 and 10

Golden Gate's Preliminary Objections 4, 5, 6, 7, 8 and 10 all pertain to the alleged UTPCPL violations.[5]

---

[5] Golden Gate's Preliminary Objections 4, 5, 6, 7, 8 and 10 specify as follows:

- Preliminary Objection 4 – Demurrer - the Amended Complaint fails to state a claim under Sections 2(4)(v) or 201-2(4)(ix) of the UTPCPL (marketing materials).

- Preliminary Objection 5 – Demurrer - the Amended Complaint fails to state a claim under Section 2(4)(x) of the UTPCPL.

- Preliminary Objection 6 – Insufficient Specificity in the Complaint - the Amended Complaint fails to inform Golden Gate of any specific bases on which the Commonwealth is seeking recovery under Section 2(4)(xxi) of the UTPCPL (the catch-all provision).

- Preliminary Objection 7 – Demurrer - the Commonwealth failed to plead any potential fraud claim under Section 2(4)(xxi) of the UTPCPL with the required particularity.

Initially, we note that Section 3 of the UTPCPL states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined [in Section 2(4)(i)-(xxi) of the UTPCPL[6]] . . . are hereby declared unlawful." 73 P.S. § 201-3. Section 2(4) of the UTPCPL provides, in relevant part:

> '**Unfair methods of competition'** and '**unfair or deceptive acts or practices'** mean any one or more of the following:
>
> . . . .
>
> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
>
> . . . .
>
> (ix) Advertising goods or services with intent not to sell them as advertised;
>
> (x) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;
>
> . . . .
>
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

---

- Preliminary Objection 8 – Insufficient Specificity in the Complaint - the Amended Complaint fails to set forth with sufficient specificity a claim for false advertising under the UTPCPL.

- Preliminary Objection 10 – Demurrer - the Commonwealth may not seek restitution or restoration under Section 4.1 of the UTPCPL, added by the Act of November 26, 1976, P.L. 1166, 73 P.S. § 201-4.1, because the Commonwealth is not a "person" as defined in the UTPCPL.

[6] 73 P.S. § 201-2(4)(i)-(xxi).

73 P.S. § 201-2(4). This Court has explained:

> An act or a practice is deceptive or unfair if it has the 'capacity or tendency to deceive.' **Neither the intention to deceive nor actual deception must be proved; rather, it need only be shown that the acts and practices are capable of being interpreted in a misleading way. The test for the [C]ourt is to determine the overall impression arising from the totality of what is said, as well as what is reasonably implied, in the advertisement or solicitation.** In consumer protection cases brought in the public interest by the Attorney General, where establishing a violation hinges upon the content of the solicitations themselves, summary judgment may be granted without the need for extrinsic evidence and even in the presence of extrinsic evidence offered by the defense. Moreover, we are cognizant of our [S]upreme [C]ourt's directive that the UTPCPL is to be construed liberally to effectuate its objective of protecting consumers of this Commonwealth from fraud and unfair or deceptive business practices.

*Commonwealth v. Peoples Benefit Servs. Inc.*, 923 A.2d 1230, 1236 (Pa. Cmwlth. 2007) (citations omitted; emphasis added) (*Peoples Benefit II*); *see also Pa. Dep't of Banking v. NCAS of Del., LLC*, 995 A.2d 422 (Pa. Cmwlth. 2010). Nonetheless, the UTPCPL does not apply to providers of medical services. *See Walter v. Magee Womens Hosp. of UPMC Health Sys.*, 876 A.2d 400 (Pa. Super. 2005);[7] *see also Foflygen v. R. Zemel, M.D. (PC)*, 615 A.2d 1345 (Pa. Super. 1992). "Nursing homes are not one-dimensional business enterprises, but instead they are hybrid organizations, offering both medical and non-medical services." *Zaborowski v. Hosp. Care Ctr. of Hermitage, Inc.*, 60 Pa. D. & C.4th 474, 493 (C.P. Mercer 2002). Thus, courts have held that nursing homes are liable under the UTPCPL only for the non-medical services they provide. *Id.; see also GGNSC Clarion*; *Goda v. White Cliff*

---

[7] In *Walter*, the Pennsylvania Superior Court found that the trial court had properly rejected a UTPCPL claim where "processing, review, and analysis of . . . Pap smear reports . . . [were] more akin to providing medical services than 'consumer-oriented, non[-]medical activities of a healthcare administrator.'" *Id.* at 408.

*Leasing P'ship*, 62 Pa. D. & C.4[th] 476 (C.P. Mercer 2003);[8] *Simmons v. Simpson House, Inc.* (E.D. Pa. No. 15-06636, filed December 12, 2016).

### A. Preliminary Objection 4 - Puffery

In Preliminary Objection 4, Golden Gate contends that the purported representations attributed to it in the Amended Complaint do not violate Sections 2(4)(v) and 2(4)(ix) of the UTPCPL because they do not constitute false advertising since they are puffery rather than material representations.

Courts have held that Sections 2(4)(v) and 2(4)(ix) of the UTPCPL are limited to false advertising claims. *See Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451 (E.D. Pa. 2009).[9] The United States Third Circuit Court of Appeals has explained: "Material representations must be contrasted with **statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism, which constitute no more than puffery** . . . ." *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (emphasis added; quotation marks omitted). Puffery is not actionable as false advertising. *See Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993).

> Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language.
>
> Such sales talk, or puffing, as it is commonly called, is considered to be offered and

---

[8] In *Goda*, a decedent's husband brought an action against a skilled care nursing home, alleging, *inter alia*, violations of the UTPCPL. For purposes of determining the applicability of the UTPCPL, the trial court described "medical services" as "those evaluative, diagnostic, preventative, therapeutic and supervisory services that are customarily provided by or at the direction of a physician or health care worker in order to treat a patient." *Id*. at 489. Applying that definition, the trial court reviewed each of the allegations to determine whether the alleged acts pertained to medical or non-medical services.

[9] Although federal district court decisions are not binding, they may be cited as persuasive authority. *Mannella ex rel. Mannella v. Port Auth. of Allegheny Cnty.*, 982 A.2d 130 (Pa. Cmwlth. 2009). We find *Seldon* instructive.

> understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer[, and on which no reasonable person would rely]. The 'puffing' rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific.
>
> W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 109, at 756-57 (5th ed. 1984).[10] **Puffery is distinguishable from** misdescriptions or **false representations of specific characteristics** of a product. As such, **it is not actionable**.

*Castrol, Inc.*, 987 F.2d at 945 (emphasis added). Claims that are not "specific and measurable by comparative research" are indicative of puffery. *Id*. at 946. Further:

> The conclusion that advertising text can be clear enough that it simply cannot be challenged as misleading is also consistent with numerous cases holding that puffery can be so obviously exaggerated that even credulous consumers cannot be misled. *See, e.g., Am. Italian Pasta*[ *Co. v. New World Pasta Co.*], 371 F.3d [387,] 389-90, 392-93 [(8th Cir. 2004)] (holding that puffery, including 'exaggerated statements of bluster or boast upon which no reasonable consumer would rely' are non-actionable statements under [Section] 43(a)(1)(B)) [of the Lanham Act[11]]; *United States Healthcare*[*, Inc. v. Blue Cross of Greater Phila.*], 898 F.2d [914,] 922 [(3d. Cir. 1990)] ('Mere puffing, advertising that is not deceptive for no one would rely on its exaggerated claims, is not actionable under [Section] 43(a) [of the Lanham Act].' (internal quotation marks and citations omitted)); *Marriott Corp. v. Ramada Inc.*, 826 F. Supp. 726, 728 (S.D.N.Y. 1993) (dismissing false advertising claim because ad was an obvious parody and one that no 'reasonable person would be misled — even absent the disclaimer — into believing'); *cf. Reilly v. Pinkus*, 338 U.S. 269 . . . (1949) (stating that puffery in advertisements goes

---

[10] Bracketed text in original Keeton quotation.

[11] The Trademark Act of 1946, 15 U.S.C. §§ 1051-1141n, is commonly referred to as the Lanham Act. In interpreting the UTPCPL, Pennsylvania Courts look to judicial decisions interpreting the Lanham Act for guidance. *Commonwealth v. Monumental Props., Inc.*, 329 A.2d 812 (Pa. 1974); *see also Boehm v. Riversource Life Ins. Co.*, 117 A.3d 308 (Pa. Super. 2015).

too far if 'credulous persons' rely on it as a material representation of fact).

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 254 n.17 (3d Cir. 2011).

## 1. Chain-wide Marketing Statements

In its Amended Complaint, the Commonwealth alleges that Golden Gate's alleged "marketing materials [(Marketing Statements)][12] were deceptive and misleading, because they represented that Golden Gate's [Facilities] would provide care that was not, in fact, provided a significant percentage of the time at many of [the Facilities] due to understaffing." Amended Complaint at 23, ¶ 85.[13] The Commonwealth also avers that the Marketing Statements included significant omissions. However, the law dictates that if the Marketing Statements were "offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer[, and on which no reasonable person would rely]," they are puffery, and may not form the basis for a UTPCPL action. *Castrol*, 987 F.2d at 945 (quoting W. Page Keeton, et al., *supra* at 756-57). "[T]he determination of whether an alleged misrepresentation 'is a statement of fact' or is instead 'mere

_____

[12] The Commonwealth alleges that:

> Defendants marketed the Golden Living company and its skilled nursing facilities in Pennsylvania directly to Pennsylvania consumers, disseminating brochures, Web sites, videos, advertisements, and other information containing misrepresentations about the Basic Care provided at these facilities. On information and belief, printed marketing materials were also distributed to hospitals and hospital staff that made referrals to nursing homes.

Amended Complaint at 21, ¶ 82.

[13] The Commonwealth does not identify in its Amended Complaint specifically where these Marketing Statements appear or when they were made. Golden Gate does not explicitly admit making such Marketing Statements. Thus, hereinafter, we refer to the alleged Marketing Statements as Marketing Statements.

10

puffery' is a legal question . . . ." *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) (quoting *Cook, Perkiss, & Liehe v. N. Cal. Collection Serv., Inc.,* 911 F.2d 242, 245 (9th Cir. 1990)). Thus, we review those Golden Gate Marketing Statements the Commonwealth alleges violate the UTPCPL in that context.

Marketing Statement No. 1: "We have licensed nurses and nursing assistants available to provide nursing care and help with activities of daily living (ADLs). Whatever your needs are, we have the clinical staff to meet those needs." Amended Complaint at 22, ¶ 83(a). This statement contains "subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism," *EP Medsystems*, 235 F.3d at 872, and is "expressed in broad, vague, and commendatory language." *Castrol*, 987 F.2d at 945. It does not contain a "false representation[] of **specific characteristics**" of the services offered. *Id.* (emphasis added). The Commonwealth does not contend that Golden Gate does not have licensed nurses and nursing assistants for the purpose of providing nursing care and helping with ADLs. Rather, it maintains that Golden Gate does not have sufficient staff to render care. However, Marketing Statement No. 1 makes no representation that nurses will be **immediately** available to provide such assistance, or that it will be provided within a specific time frame. Thus, we conclude that Marketing Statement No. 1 is puffery.

Marketing Statement No. 2: "Snacks and beverages of various types and consistencies are available at any time from your nurse or nursing assistant." Amended Complaint at 22, ¶ 83(b). This statement contains no more than "broad, vague, and commendatory language." *Castrol*, 987 F.2d at 945. The Commonwealth does not assert in its Amended Complaint that snacks and beverages were not always **available** from staff, but rather, that there was insufficient staffing to **timely** respond to residents' requests. Because Marketing Statement No. 2's references to the

availability of "snacks and beverages of **various types**" at "**any time**" are vague and broad, it is puffery.  Marketing Statement No. 2 (emphasis added).

Marketing Statement No. 3: "A container of fresh ice water is put right next to your bed every day, and your nursing assistant will be glad to refill or refresh it for you."  Amended Complaint at 22, ¶ 83(c).  This Marketing Statement contains "subjective analysis or extrapolations, such as opinions, motives and **intentions**, or **general statements of optimism**," *EP Medsystems*, 235 F.3d at 872 (emphasis added), and is "an exaggeration or overstatement expressed in broad, vague, and commendatory language."  *Castrol*, 987 F.2d at 945.  Accordingly, Marketing Statement No. 3 is puffery.

Marketing Statement No. 4: "Clean linens are provided for you on a regular basis, so you do not need to bring your own."  Amended Complaint at 22, ¶ 83(d).  The term "regular basis" is "vague" and undefined.  *Id*.; *Castrol*, 987 F.2d at 945.  The statement does not contain a "false representation[] of **specific characteristics**" of the services offered.  *Castrol*, 987 F.2d at 945 (emphasis added).  For these reasons, Marketing Statement No. 4 is puffery.

Marketing Statement No. 5:

> Providing exceptional dining is **important to us**.  Not only do **we want** to meet your nutritional needs, but **we want to** exceed your expectations by offering a high level of service, delicious food and an overall pleasurable dining experience.  Dining in the LivingCenter is all about choice.  With a variety of flavors, an attractive environment and plenty of pleasant conversation, **we hope** the experience will nourish both your body and your soul, so please join us.  We have a seat reserved for you in our dining room!

Amended Complaint at 22, ¶ 83(e) (emphasis added).  The Marketing Statement primarily expresses Golden Gate's priorities and intentions for residents, rather than makes specific objective representations about the quality of the dining experience.

This Marketing Statement does not contain a "false representation[] of **specific characteristics**" of the services offered. *Castrol*, 987 F.2d at 945 (emphasis added). Instead, it encompasses "subjective analysis or extrapolations, such as opinions, **motives and intentions**, or **general statements of optimism**," *EP Medsystems*, 235 F.3d at 872 (emphasis added), and is "an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol*, 987 F.2d at 945. Further, the Commonwealth's alleged misrepresentations relate to residents' inability to make use of the dining facilities due to staffing shortages, rather than the quality of the dining experience. We do not interpret the statement "[w]e have a seat reserved for you in our dining room[,]" as a promise that residents will always be brought to the dining facilities. Amended Complaint at 22, ¶ 83(e). Accordingly, Marketing Statement No. 5 is puffery.

Marketing Statement No. 6: "[**W**]**e believe** that respecting your individuality and dignity is of utmost importance." Amended Complaint at 23, ¶ 84(a) (emphasis added). Based on the preface alone, "we believe," it is clear that this statement contains "subjective analysis or extrapolations, such as opinions, **motives and intentions**, or **general statements of optimism**," *EP Medsystems*, 235 F.3d at 872 (emphasis added), and is "an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol*, 987 F.2d at 945. The Marketing Statement communicated that it was "offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer[, and on which no reasonable person would rely]." *Id.* at 945 (quoting W. Page Keeton, et al., *supra* at 756-57). Therefore, Marketing Statement No. 6 is puffery.

Marketing Statement No. 7: "A restorative plan of care is developed to reflect the resident's goals and is designed to improve wellness and function. The goal is to maintain optimal physical, mental and psychosocial functioning." Amended Complaint at 23, ¶ 84(b). First, the Commonwealth makes no allegation

that "restorative plan[s] of care" were not developed, or not reflective of resident's goals, but rather it alleges that the plans were incomplete or not properly followed or updated. Amended Complaint at 23, ¶ 84. Next, although the first sentence in the Marketing Statement is a specific representation that "a restorative plan of care is developed[,]" the descriptive words that follow – that the plan will "**reflect** the resident's goals and is **designed to improve** wellness and function[,]" constitute "subjective analysis or extrapolations, such as **opinions**, **motives and intentions**, or **general statements of optimism**." *EP Medsystems*, 235 F.3d at 872 (emphasis added). Further, because there is no allegation the promise was not delivered it is not actionable. The second sentence in the Marketing Statement describing Golden Gate's goal contains "subjective analysis or extrapolations, such as opinions, **motives and intentions**, or **general statements of optimism**," *EP Medsystems*, 235 F.3d at 872 (emphasis added). Accordingly, Marketing Statement No. 7 is puffery.

Marketing Statement No. 8: "We work with an interdisciplinary team to assess issues and nursing care that **can** enhance the resident's psychological adaptation to a decrease in function, increase levels of performance in daily living activities, and prevent complications associated with inactivity." Amended Complaint at 23, ¶ 84(c) (emphasis added). This statement contains "subjective analysis or extrapolations, such as opinions, **motives and intentions**, or **general statements of optimism**," *EP Medsystems*, 235 F.3d at 872 (emphasis added). Further, because the Commonwealth has not alleged that Golden Gate does not "work with an interdisciplinary team to assess issues and nursing care," Amended Complaint at 23, ¶ 84(c), the statement does not contain a "false representation[] of specific characteristics" of the services offered. *Castrol*, 987 F.2d at 945. Thus, Marketing Statement No. 8 is puffery.

Marketing Statement No. 9: "**Our goal** is to help you restore strength and confidence so you feel like yourself again and can get back to enjoying life the

way you should. That's The Golden Difference." Amended Complaint at 23, ¶ 84(d) (emphasis added). The statement primarily discusses Golden Gate's priorities and intentions for residents. It contains "subjective analysis or extrapolations, such as **opinions, motives and intentions**, or **general statements of optimism**," *EP Medsystems*, 235 F.3d at 872 (emphasis added), and is "an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol*, 987 F.2d at 945. For these reasons, we conclude Marketing Statement No. 9 is puffery.

Because Golden Gate's chain-wide Marketing Statements quoted in paragraphs 83 and 84 of the Amended Complaint are puffery and, thus, may not form the basis of a UTPCPL claim, Preliminary Objection 4 is sustained as it pertains to those Marketing Statements.

## 2. Facility-level Representations

In the Amended Complaint, the Commonwealth also alleges that Golden Gate's individual Facilities "made deceptive, misleading, and unfair misrepresentations to the Commonwealth and to consumers regarding the care they provided in [M]arketing [Statements], resident assessments[,] care plans[] and bills, creating a likelihood of confusion and misunderstanding." Amended Complaint at 24, ¶ 88.

### a. Marketing Statements

For the reasons discussed above, the Marketing Statements are puffery and do not support the Commonwealth's UTPCPL claim.[14]

---

[14] As previously explained, the UTPCPL does not apply to medical services; thus Marketing Statements 7, 8 and 9 would not form the basis for a UTPCPL claim. *See Goda*; *see also GGNSC Clarion; Walter; Zaborowski.*

### b. Resident Assessments,[15] Care Plans and Bills

The Commonwealth, in its Amended Complaint, alleges violations of Sections 2(4)(v), 2(4)(ix), 2(4)(x), and 2(4)(xxi) of the UTPCPL, resulting from the Facilities' failure to adhere to numerous patient-specific representations made in resident assessments and care plans. Rather than quote the specific wording therein, the Commonwealth describes numerous instances where care purportedly promised in resident care plans was not provided. *See, e.g.,* Amended Complaint at 34, ¶ 120; 35-37, ¶ 121; 41, ¶ 125; 48-52, ¶ 135; 68, ¶ 153; 73-76, ¶ 159; 88-91, ¶ 182; 93, ¶ 185; 99-102, ¶ 192; 116-118, ¶ 208; 125, ¶ 214. The Commonwealth also alleges that it was billed for services that were not provided.

---

[15] The Amended Complaint alleges:

> Under federal and state law, nursing homes are required to complete a resident assessment, known as a Minimum Data Set [(MDS)], for each resident within 14 days of his arrival at the facility. The MDS is an individualized, date-specific assessment of each resident's needs; it must be updated each quarter while the resident is at the facility, or whenever a significant change in the resident's health or capabilities is observed. Among other things, the MDS evaluates each resident's functional capabilities to perform activities of daily living ('ADLs'). The MDS is based on actual observations of resident care provided over a seven-day period, not a prospective assessment of what care a resident will need. It describes the actual assistance the facility provided and will provide going forward, and that the resident received. The MDS reflects, for each ADL, whether the resident could complete the ADL independently, required assistance (supervision only, limited assistance, or extensive assistance), or was totally dependent on staff. If the resident required assistance with a particular ADL, the MDS also reflects whether the resident needed set-up help only, the assistance of one staff member, or the assistance of two staff members.

Amended Complaint at 25-26, ¶ 92. Accordingly, our discussion of resident assessments includes MDS.

In *Seldon*, the United States District Court for the Eastern District of Pennsylvania addressed a similar situation. There, the plaintiffs brought an action against a lender and a loan servicing company, alleging, *inter alia*, a claim for fraudulent and deceptive conduct pursuant to the UTPCPL. Specifically, after falling behind in their mortgage payments, the plaintiffs contacted the defendants and the parties reached an agreement on an alternative payment plan intended to bring the plaintiffs current on their mortgage. However, the plaintiffs alleged in their complaint that the defendants made material misrepresentations concerning the repayment plan. The defendants filed a motion to dismiss. The court addressed the relevant UTPCPL claims as follows:

> [The p]laintiffs . . . allege violations of [Sections 2(4)(v) and (ix) [of the UTPCPL]. **Section** []**2(4)(v)** [**of the UTPCPL**] forbids '[r]epresenting that goods or services have . . . characteristics, . . . benefits or quantities that they do not have.' **Section** []**2(4)(ix)** [**of the UTPCPL**] prohibits '[a]dvertising goods or services with intent not to sell them as advertised.' Pennsylvania state and federal courts have ruled that both of **these subsections apply only to claims of false advertising.** *Karlsson v.* [*Fed. Deposit Ins. Corp.*]*,* 942 F. Supp. 1022, 1023 (E.D. Pa. 1996), *aff'd,* 107 F.3d 862 (3d Cir. 1997); *Weinberg v. Sun Co.,* 740 A.2d 1152, 1167 (Pa. Super. 1999), *rev'd on other grounds,* . . . 777 A.2d 442 ([Pa.] 2001).[16] To set forth a claim for false advertising under these provisions of the UTPCPL, a plaintiff must allege: (1) 'a defendant's representation is false'; (2) 'it actually deceives or has a tendency to deceive'; and (3) 'the representation is likely to make a difference in the purchasing decision.' *Fay v. Erie Ins. Gr*[*p.*]*,* 723 A.2d 712, 714 (Pa. Super. 1999) (listing elements for violation of [Section] 2(4)(v)[ of the UTPCPL]); *see Weinberg,* 740 A.2d at 1167 (stating same elements apply to [Section] 2(4)(ix)) [of the UTPCPL].

*Seldon*, 647 F. Supp. 2d at 466 (emphasis added).

---

[16] *See also Commonwealth v. Percudani*, 844 A.2d 35 (Pa. Cmwlth. 2004).

We note that a claim of false advertising, by its very nature, requires that a representation be **advertised**. Since the UTPCPL does not define "advertising," we consider judicial interpretation of the term under the Lanham Act.[17]

The United States District Court for the Eastern District of Pennsylvania explained:

> 'The threshold matter in addressing an alleged false statement actionable . . . is whether the statement constitutes 'commercial advertising or promotion.'' *Premier Comp Solutions, LLC v. Penn Nat'l Ins. Co.,* No. Civ.A.07–1764, 2012 WL 1038818, at *7 (W.D. Pa. Mar. 28, 2012) (quoting 15 U.S.C. § 1125(a)(1)(B)). In the absence of an express definition of 'commercial advertising or promotion' in the Lanham Act, courts have developed a four element test to define these terms in accordance with the Act's language and congressional intent. *Bracco Diagnostics, Inc. v. Amersham Health, Inc.,* 627 F. Supp. 2d 384, 455–56 (D. N.J. 2009); *Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc.,* 515 F. Supp. 2d 565, 578 (W.D. Pa. 2007). 'Commercial advertising or promotion for purposes of the Lanham Act consists of (1) commercial speech; (2) by a defendant in commercial competition with [others in the market]; (3) designed to influence customers to buy the defendant's products; (4) **that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry.**' *Synygy, Inc. v. Scott-Levin, Inc.,* 51 F. Supp. 2d 570, 576 (E.D. Pa. 1999). **Only after determining that the relevant statement constitutes commercial advertising or promotion does a court consider the remaining elements of a Lanham Act claim based on a false or misleading**

---

[17] Section 1903(a) of the Statutory Construction Act of 1972 provides that when words in a statute are undefined, they must be accorded "their common and approved usage[.]" 1 Pa.C.S. § 1903(a). "Where a court needs to define an undefined term, it may consult definitions in statutes, regulations or the dictionary for guidance, although such definitions are not controlling." *Adams Outdoor Adver., LP v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006). *Black's Law Dictionary* (9th ed. 2009) defines "advertising" as "[t]he action of drawing the public's attention to something to promote its sale." *Id.* at 63. Further, according to *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004), "advertising" is "the action of calling something to the attention of the public esp[ecially] by paid announcements." *Id.* at 19.

**representation** of a product under 15 U.S.C. § 1125(a)(1)(B). *Premier Comp Solutions,* 2012 WL 1038818, at *7. While courts disagree about whether the Lanham Act reaches certain oral statements, **it is well-settled that the challenged statements, at the very least, must be 'widely disseminated' and 'part of an organized campaign to penetrate the relevant market.'** *Fashion Boutique v. Fendi USA, Inc.,* 314 F.3d 48, 56-57 (2d Cir. 2002). 'Although advertising is generally understood to consist of widespread communication through print or broadcast media, 'promotion' may take other forms of publicity used in the relevant industry, such as displays at trade shows and sales presentations to buyers.' *Id.* at 57.

Notably, **it is well[-]established that 'isolated statements to potential customers generally do not constitute sufficient dissemination to be defined as advertising** within the meaning of the Lanham Act' and 'private statements to competitors—without more—falls short of commercial advertising as defined in the Act.' *Pitney Bowes, Inc. v. ITS Mailing Sys. Inc.,* No. Civ.A.09–5024, 2010 WL 1005146, at *5 (E.D. Pa. Mar. 17, 2010) (emphasis omitted) (citing *Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.,* No. Civ.A.00–3683, 2001 WL 856946, at *11 (E.D. Pa. July 26, 2001) ('Generally, isolated private statements are not sufficiently disseminated to constitute advertising.')). Thus, '[p]roof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement,' and 'isolated disparaging statements do not have redress under the Lanham Act.' *ConsulNet Computing, Inc. v. Moore,* No. Civ.A.04–3485, 2007 WL 2702446, at *11 (E.D. Pa. Sept. 12, 2007) (quotations omitted).

*Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 716-17 (E.D. Pa. 2014) (emphasis added).

Consistent with the above, the *Seldon* Court concluded:

Here, plaintiffs have presented no facts regarding defendants' production of any false advertising. Instead, **plaintiffs allege that defendants misrepresented the benefits, fees, and amounts owed concerning the loan and misrepresented the scheduled monthly payments under the repayment plan. Because individual**

19

> **employees or agents of defendants made these representations, they do not qualify as advertising and cannot constitute a violation of the UTPCPL's false advertising prohibition.** *See Thompson v. The Glenmede Trust Co.,* No. 04428, 2003 WL 1848011, at *1 (Pa. Ct. Com. Pl. Philadelphia County Feb. 18, 2003) ('Individual representations made by [defendants] upon which [p]laintiffs allegedly relied do not constitute 'advertising' as intended by the UTPCPL.'). For plaintiffs' claim under [Section] 2(4)(ix)[ of the UTPCPL], plaintiffs have also failed to allege that defendants intentionally engaged in false advertising. *See Karlsson,* 942 F. Supp. at 1023 (noting that [Section] 2(4)(ix) [of the UTPCPL] requires element of intent). Because plaintiffs do not allege the elements of a false advertising claim under [Section 2(4)](v) or (ix) [of the UPTCPL], plaintiffs have failed to set forth a claim on which this court can grant relief.

*Seldon*, 647 F. Supp. 2d at 466 (emphasis added).

Similarly, in the instant matter, as described in the Amended Complaint, resident care plan development involves assessment and representations made by the Facilities' staff. Specifically, the resident and his or her

> 'care team' will sit down together (called a 'care coordination' meeting), usually within 72 hours of admission, and review what the assessments say, including what you can do for yourself and what you may need assistance with. Your care team will consist of key members of our staff, like the nurses, social worker, dietitian, etc. In effect, the care plan you develop together becomes your personal 'road map for success.'

Amended Complaint at 28-29, ¶ 96. Further, with respect to Sections 2(4)(v) and 2(4)(ix) of the UTPCPL, "[b]ecause individual employees or agents of defendants allegedly made these representations, they do not qualify as advertising and cannot constitute a violation of the UTPCPL's false advertising prohibition." *Seldon*, 647 F. Supp. 2d at 466. Moreover, **representations made in resident care plan development are not likely to make a difference in the purchasing decision, since such representations are made after an individual is admitted and becomes a**

20

**resident. Further, these "'isolated statements to . . . [customers and] potential customers . . . do not constitute sufficient dissemination to be defined as advertising . . . .'"** *Synthes, Inc.*, 25 F. Supp. 3d at 717 (emphasis added) quoting *Pitney Bowes, Inc.* at 5. **For the same reasons, resident assessments and alleged employee misrepresentations in billing do not qualify as advertising under those UTPCPL sections.** Accordingly, Golden Gate's Preliminary Objection 4 is sustained.

### B. Preliminary Objections 5, 6, 7 and 8 – Insufficient Pleadings

Golden Gate further argues that, even if the alleged representations do not constitute puffery, the Commonwealth failed to sufficiently plead facts to support the alleged UTPCPL violations. It then sets forth separate arguments which comprise Preliminary Objections 5, 6, 7 and 8.

### 1. Preliminary Objection 5

Golden Gate contends that the facts set forth in the Amended Complaint do not support a claim that it violated Section 2(4)(x) of the UTPCPL by advertising goods or services while intending not to reasonably supply public demand. Although the aforementioned discussion in *Seldon* does not address Section 2(4)(x) of the UTPCPL, the language used therein - "[**a**]**dvertising** goods or services with intent not to . . . " - is almost identical to that in Section 2(4)(ix) of the UTPCPL. 73 P.S. § 201-2(4)(x) (emphasis added). Therefore, we similarly interpret Section 2(4)(x) of the UTPCPL to "apply only to claims of false advertising." *Seldon*, 647 F. Supp. 2d at 466. For the reasons previously discussed herein, the Marketing Statements are puffery, and the representations made in resident care plans and bills do not constitute advertising. Because the alleged conduct is not false advertising, the Commonwealth failed to plead facts sufficient to support the alleged violation claim. Accordingly, Preliminary Objection 5 is sustained.

## 2. Preliminary Objection 6

Golden Gate also argues that the Amended Complaint fails to comply with the Pennsylvania Rules of Civil Procedure which require specificity in pleadings. Specifically, Golden Gate contends that the Commonwealth failed to plead facts necessary to support its claim that Golden Gate violated Section 2(4)(xxi) of the UTPCPL. Further, Golden Gate asserts that "[the Commonwealth's] Amended Complaint fails to set forth specific factual allegations regarding [Golden Gate's] deviation from any particular resident's care plan or [resident assessment], or a single instance when [Golden Gate] billed a resident or the Commonwealth for services that were not actually provided." Preliminary Objections at 20, ¶ 63. Golden Gate claims that "the only factual support [the Commonwealth] provides for [its] conclusory allegations takes the form of vague, general and non-specific statements attributed to unnamed, former employees and other 'Confidential Witness[es].'" Preliminary Objection 6 at 20, ¶ 62 (quoting Amended Complaint at 34-147, ¶¶ 119-239).

We acknowledge:

> [Pennsylvania Rule of Civil Procedure] No. [(Rule)] 1019(a) provides that '[t]he material facts on which a cause of action or defense is based shall be stated in a concise and summary form.' This rule requires a plaintiff to plead all the facts that must be proved in order to achieve recovery on the alleged cause of action. Moreover, the pleading must be sufficiently specific so that the defending party will know how to prepare his defense.

*Commonwealth v. Peoples Benefit Servs. Inc.*, 895 A.2d 683, 689 n.10 (Pa. Cmwlth. 2006) (*Peoples Benefit I*). "It may be granted that 'the lower court has broad discretion in determining the amount of detail that must be averred since the standard of pleading set forth in Rule 1019(a) is incapable of precise measurement. Goodrich-Amram § 1019(2)-10&11.' *United Refrigerator Co. v. Applebaum,* 410 Pa. 210, 213,

189 A.2d 253, 255 (1963)." *Pike Cty. Hotels Corp. v. Kiefer*, 396 A.2d 677, 681 (Pa. Super. 1978).

In the instant case, the Amended Complaint sets forth numerous examples of instances where Golden Gate allegedly failed to comply with resident care plans. *See, e.g.,* Amended Complaint at 34, ¶ 120; 35-37, ¶ 121; 41, ¶ 125; 48-52, ¶ 135; 68, ¶ 153; 73-76, ¶ 159; 88-91, ¶ 182; 93, ¶ 185; 99-102, ¶ 192; 116-118, ¶ 208; 125, ¶ 214. However, there are no allegations specifically identifying any particular resident care plan or MDS from which the Facility deviated, or any allegation identifying any specific bill for services that were not provided. The Commonwealth asserts that "[t]here is no requirement in Pennsylvania law that the Commonwealth set forth specific deviations from any particular resident's care plan or MDS, or that the Commonwealth identify in its complaint individual bills for services to individual residents that were not actually provided." Commonwealth's Answer to Preliminary Objections at 28. It further contends that this Court may "reasonably infer that the pervasive and significant omissions of care alleged . . . reflect deviations from care contemplated in residents' MDS assessments and care plans[.]" *Id*. at 28-29. The Commonwealth asks this Court to make assumptions based on **general allegations** describing documents it has not provided. This, the Court is not prepared to do.

Section 2(4)(xxi) of the UTPCPL prohibits "[e]ngaging in any . . . fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). Golden Gate contends that while the Commonwealth in the Amended Complaint asserts that deceptive resident assessments and billing statements were submitted to it and/or the insurers, the Commonwealth failed to allege how documents not issued to consumers could deceive consumers. Golden Gate further maintains that the Amended Complaint does not reflect facts explaining how a consumer could be misled by a billing statement to

23

believe that he received services or assistance that he had not in fact received, or how an un-itemized per diem charge could convey to a consumer that a particular service had been provided in the first place.

> Notably, Rule 1019(i) states:
>
> When any claim or defense is based upon a writing, **the pleader shall attach a copy of the writing**, or the material part thereof, but if the writing or copy is not accessible to the pleader, it is sufficient so to state, together with the reason, and to set forth the substance in writing.

Pa. R.C.P. No. 1019(i) (emphasis added).

The general allegations of wrongdoing pertaining to unidentified Marketing Statements, resident care plans, billing statements and MDSs are not sufficiently specific to meet the pleading requirement, especially given that the documents were not attached to the Amended Complaint, and neither the patients nor the documents were sufficiently described to permit Golden Gate to prepare a defense.[18] Accordingly, Preliminary Objection 6 is sustained.[19]

---

[18] The Commonwealth did not state in the Amended Complaint that the Marketing Statements, resident care plans, billing statements or MDSs were not accessible and the reason therefor in accordance with Rule 1019(i).

[19] The Concurrence/Dissent maintains that the Majority has, *sua sponte,* raised the issue of the Commonwealth's failure to attach the subject documents. Such is not the case. Golden Gate explicitly raised the issue of the Commonwealth's lack of specificity in its pleading in accordance with the Pennsylvania Rules of Civil Procedure. Indeed, Golden Gate contends that the Commonwealth

> asserts that Golden Living made deceptive representations in three forms: (1) 'care **plans** shared with residents that outlined the care that the Facilities promised to provide;' (2) 'billing **statements** that included a per diem charge leading recipients to believe that all services had been provided;' and (3) . . . '**MDSs**'[] that were submitted to the Commonwealth on a quarterly basis (or more frequently) for each resident covered by Medicaid and monthly billing statements submitted for Medicaid payments' which 'created the impression that the Golden Living Facilities had provided, and would continue to provide, a level of care that was not provided.'

24

### 3. Preliminary Objection 7

Golden Gate asserts in Preliminary Objection 7 that "[t]o the extent [the Commonwealth's] Amended Complaint alleges a claim for fraud against [Golden Gate under the UTPCPL's catch[-]all provision (Section 2(4)(xxi) of the UTPCPL)], that claim should be dismissed pursuant to [Pennsylvania Rule of Civil Procedure] Nos. 1028(a)(4) and 1019(b) for failure to plead the claim with particularity." Preliminary Objection 7 at 22, ¶ 71.

Rule 1019(b) provides, in relevant part, that "[a]verments of fraud or mistake shall be averred with particularity." Pa.R.C.P. No. 1019(b). Rule 1028(a)(4) permits a party to file preliminary objections on the basis of a pleading's legal insufficiency. Notwithstanding, in *Commonwealth v. Percudani*, 825 A.2d 743 (Pa. Cmwlth. 2003), *amended*, 851 A.2d 987 (2004), this Court held that a claim under Section 2(4)(xxi) of the UTPCPL is subject to a lesser standard than common law fraud.[20] As this Court later explained in *Commonwealth v. Manson*, 903 A.2d 69 (Pa. Cmwlth. 2006):

> Prior to the 1996 amendments to the [UTPCPL], [S]ection 2(4)(xxi) [of the UTPCPL] merely prohibited 'fraudulent

Preliminary Objection 6 at 19-20, ¶ 61 (emphasis added) (quoting Amended Complaint at 157, ¶¶ 267, 269). Accordingly, Golden Gate's assertion that, "the only factual support [the Commonwealth] provides for [its] conclusory allegations takes the form of vague, general and non-specific statements attributed to unnamed, former employees and other 'Confidential Witness[es]'" expresses the very deficiency resulting from the Commonwealth's failure to attach the documents. Preliminary Objection 6 at 20, ¶ 62 (quoting Amended Complaint at 34-147, ¶¶ 119-239). Further, the Concurrence/Dissent's speculation that the Commonwealth might not have attached the documents based on privacy concerns is simply conjecture on its part. Nonetheless, it is clear that the Commonwealth gave **no** written explanation for its failure to so attach the documents, and thus it did not comply with Rule 1019(i).

[20] "[T]o establish fraud, a plaintiff must prove: (1) the misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damage to the party defrauded as a proximate result." *Commonwealth v. Manson*, 903 A.2d 69, 74 n.5 (Pa. Cmwlth. 2006).

conduct,' and a plaintiff had to establish the elements of common law fraud to prove a claim. [*Percudani*]. The 1996 amendments revised the provision to prohibit 'fraudulent or deceptive conduct.' *Id.*

Even after the 1996 amendments became effective, our [S]uperior [C]ourt has continued to interpret [S]ection 2(4)(xxi) [of the UTPCPL] to require that a plaintiff establish the elements of common law fraud to prove a claim. *Id.* However, this court has rejected that interpretation because: (1) the statute is to be liberally construed to effectuate the legislative goal of consumer protection; (2) the legislature's addition of the words 'or deceptive' signals a less restrictive interpretation; and (3) maintaining the pre-1996 requirement would render the words 'or deceptive conduct' redundant and superfluous, contrary to the rules of statutory construction. *Id.*

The question, then, is not whether a company or corporate officer engaged in conduct that was intended to deceive consumers. Rather, **the question is whether the company or corporate officer engaged in conduct that might be 'deceptive to the ordinary consumer**.' *Id.* at 746.

*Manson*, 903 A.2d at 74 (emphasis added; footnotes omitted); *see also Peoples Benefit I; Bennett v. A.T. Masterpiece Homes at Broadsprings*, *LLC*, 40 A.3d 145 (Pa. Super. 2012).

The Commonwealth reaffirms in its brief that it is "proceeding under [Section 2(4)(xxi) of the UTPCPL's] 'deceptive' prong[.]" Commonwealth's Br. at 22 n.7. Accordingly, because the Commonwealth was not required to meet the particularity requirements for common law fraud claims, Preliminary Objection 7 is overruled.

### 4. Preliminary Objection 8

Lastly, Golden Gate contends that although the Commonwealth alleges in its Amended Complaint false advertising claims under Sections 2(4)(v) and 2(4)(ix) of the UTPCPL and that deceptive, misleading and unfair statements appeared in the Marketing Statements to Pennsylvania consumers and hospital staff,

26

the Commonwealth failed to specify: (1) who was allegedly deceived by the Marketing Statements; (2) the particular Marketing Statements in which each allegedly deceptive statement appeared; (3) where those Marketing Statements were allegedly disseminated; and, (4) when those Marketing Statements were allegedly disseminated. According to Golden Gate, a false advertising claim under the UTPCPL requires the Commonwealth to demonstrate that the false advertisement actually deceived or had a tendency to deceive a substantial segment of its audience. Having already determined that the Marketing Statements constitute puffery and are not material misrepresentations, Golden Gate's Preliminary Objection 8 is sustained.

## C. Preliminary Objection 10[21]

---

[21] The Concurrence/Dissent asserts that because the Majority dismisses the underlying substantive claims, "there is no need to decide whether the Commonwealth is a 'person in interest entitled to restitution or restoration under Section 4.1 of the UTPCPL and, therefore, the question is moot and the discussion related thereto is merely dicta." Concurring/Dissenting Op. at 3. The Concurrence/Dissent similarly objects to the Majority's discussion of Preliminary Objection 12.

However, "[p]reliminary objections are permissible in an original jurisdiction action, [Pennsylvania Rule of Appellate Procedure] 1516[(b)], and are to be made in accordance with the appropriate Rule of Civil Procedure. *See* Pa.R.A.P. 1517; *see also* Pa.R.C.P. [No.] 1028 (Preliminary Objections)." *Uniontown Newspapers, Inc. v. Roberts*, 839 A.2d 185, 190 (2003), *aff'd*, 909 A.2d 804 (Pa. 2006). Rule 1028(c)(2) specifically requires, in pertinent part, that "[**t**]**he court** *shall determine* **promptly** *all* **preliminary objections**." Pa.R.C.P. No. 1028(c)(2) (bold and italic emphasis added).

Moreover:

> According to *Black's Law Dictionary,* 'dictum,' is generally used as an abbreviated form of 'obiter dictum,' or 'a remark by the way.' To elaborate, it is described as[:]
>
>> [A]n observation or remark made by a judge in pronouncing an opinion upon a cause, concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but **not necessarily involved in the case or essential to its determination**. . . . Statements and comments in

In Preliminary Objection 10, Golden Gate avers that the Commonwealth may not recover restoration under Section 4.1 of the UTPCPL. Under the UTPCPL, only a "person in interest" may seek restoration. 73 P.S. § 201-4.1. The UTPCPL defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." 73 P.S. § 201-2(2). According to Golden Gate, since the UTPCPL's definition of "person" does not include the Commonwealth, it may not seek restoration on its own behalf.

In support of its position, Golden Gate relies on *Meyer v. Community College of Beaver County*, 93 A.3d 806 (Pa. 2014) (*Meyer II*), wherein our Supreme Court considered whether the UTPCPL "defines a 'person' subject to liability as including both private entities and political subdivision agencies." *Id*. at 808. The Supreme Court therein explained:

> Where the words of the statute at issue are not explicit, this Court may consider, *inter alia*, the following criteria: '[t]he circumstances under which it was enacted,' '[t]he mischief to be remedied,' '[t]he object to be attained,' '[t]he former law, if any, including other statutes upon the same or similar subjects,' and '[t]he consequences of a particular

---

an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand are obiter dicta, and lack the force of adjudication.

*Black's Law Dictionary* 409 (5th ed. 1979). *See also Stellwagon v. Pyle*, . . . 133 A.2d 819 ([Pa.] 1957) (language in judicial opinion **going beyond issue decided** is considered dictum); *O'Neill v. Metropolitan Life Ins. Co.*, . . . 26 A.2d 898 ([Pa.] 1942) (statement of court on **an issue not raised** is dictum).

*Giffear v. Johns-Manville Corp.*, 632 A.2d 880, 884 n.6 (Pa. Super. 1993) (emphasis added), *aff'd sub nom. Simmons v. Pacor, Inc.*, 674 A.2d 232 (Pa. 1996). Clearly, addressing and deciding a preliminary objection presented to the Court is not dicta.

In addition to the Majority addressing and resolving **all** the preliminary objections **raised as directed by Rule 1028(c)(2)**, because the Commonwealth may choose to seek leave of Court to refile its Amended Complaint or bring similar complaints against other providers there is a likelihood that this or other similar matters may return to this Court.

28

interpretation.' 1 Pa.C.S.[] § 1921(c). In our view, **although it is a close question, the aforementioned factors suggest that the legislature did not intend to define 'person' as including political subdivisions and their agencies**.

First, at the time of the UTPCPL's adoption, the common law provided both a doctrine of sovereign immunity, as well as a derivative interpretive presumption against depriving the state of sovereign rights or property, both of which arguably extended to political subdivision agencies. Given the extant ubiquity of these doctrines, we find it unlikely that the legislature would depart from them with such general language as 'any other legal entities.'

Furthermore, . . . **the legislature enacted the UTPCPL** to account for the fundamental inequality between buyer and seller, and **to protect consumers from exploitative merchants**. The parties offer, and we discern, no evidence to suggest that, in enacting the UTPCPL, the General Assembly was concerned with and, thus, sought to eliminate unfair trade practices in the public sphere.

Finally, the consequences of adopting an interpretation of 'person' to include political subdivision agencies strongly suggest to us that the General Assembly did not intend their inclusion. First, in the context of public enforcement actions, the UTPCPL provides that the Attorney General or a District Attorney may obtain, 'on behalf of the Commonwealth,' civil penalties in varying amounts, up to $5,000 per violation. [Section 8 of the UTPCPL,] 73 P.S. § 201-8. Likewise, in the context of private actions, plaintiffs may recover treble damages in an amount up to three times the amount of their actual damages, as well as costs and attorney fees. *See* [Section 9.2 of the UTPCPL, added by the Act of November 24, 1976, P.L. 1166, *as amended*,] 73 P.S. § 201-9.2. These damages, although designed, in part, for other more remedial purposes, do contain a deterrent, punitive element. *See Schwartz v. Rockey*, . . . 932 A.2d 885, 898 ([Pa.] 2007) (noting the treble damage provisions are 'a hybrid,' with both punitive and remedial aspects) (internal quotations and citations omitted). Although the legislature certainly has the authority to impose punitive sanctions and damages upon its political subdivisions, the proceeds of which would go to its own treasury, we are of

29

the opinion that it would not take such an uncharted course without making a clearer statement, particularly given our longstanding precedent that governmental agencies are ordinarily immune from common[]law punitive damages.

Moreover, under certain circumstances, the Attorney General may seek the 'dissolution, suspension or forfeiture of the franchise or right to do business' of a 'person' who violates a court's injunction against an unfair or deceptive practice, as well as the appointment of a receiver to manage the party's affairs. *See* [Section 9 of the UTPCPL,] 73 P.S. § 201-9. In our view, it is incongruous that the General Assembly would adopt a provision effectively authorizing the Attorney General, with court approval, to eliminate political subdivisions.

In sum, we hold the UTPCPL is ambiguous as to whether political subdivision agencies constitute 'persons.' However, based on our consideration of the law prior to the UTPCPL's enactment, the UTPCPL's purpose, and the consequences of a holding that it applies to such agencies, **we conclude the legislature did not intend for the definition of 'person' to include political subdivision agencies**.

*Meyer II*, 93 A.3d at 814-15 (citations omitted; emphasis added).

Although, in *Meyer II*, the issue was whether a political subdivision agency can be a person *liable* under the UTPCPL, Golden Gate argues that the Supreme Court's pronouncement also precludes the Commonwealth from being a "**person** in interest," entitled to seek restoration under the UTPCPL. 73 P.S. § 201-4.1 (emphasis added). When presented with the issue of giving "person" different meanings in various sections of the statute, both this Court's majority and (now) President Judge Leavitt's dissenting opinion in *Meyer v. Community College of Beaver County,* 30 A.3d 587 (Pa. Cmwlth. 2011) (*Meyer I*), *rev'd*, *Meyer II*, concluded that the term "person" must have a consistent meaning throughout the UTPCPL.[22]

_____

[22] In her dissenting opinion, (now) President Judge Leavitt stated:

30

On the same date the Supreme Court issued the *Meyer II* decision, it decided *Commonwealth v. TAP Pharmaceutical Products*, 94 A.3d 350 (Pa. 2014).

> I agree with the majority that if the Commonwealth or a local agency is a person for purposes of being a plaintiff under the [UTPCPL], then it follows that either must also be a 'person' for purposes of being a defendant. Stated otherwise, the word 'person' must have one meaning for all purposes of the statute.

*Meyer I,* 30 A.3d at 604 (Leavitt, J., dissenting).

The Concurrence/Dissent essentially argues that the word "person" should be interpreted differently under different sections of the UTPCPL. It asserts that the reasoning in *Meyer II* is inapplicable to the instant matter since "no liability will be imposed upon a government entity; instead, the Commonwealth is seeking restitution and restoration from Golden Gate, a merchant, for money the Commonwealth paid as a result of the alleged deception." Concurring/Dissenting Op. at 4. However:

> It is axiomatic that in determining legislative intent, all sections of a statute must be read together and in conjunction with each other, and construed with reference to the entire statute. **When the meaning of a word or phrase is clear when used in one section, it will be construed to mean the same thing in another section of the same statute**. A conflict between various statutes or parts thereof is to be avoided and, if possible, the apparently conflicting provisions must be construed together with the more specific provisions prevailing over the general ones.

*Housing Authority of County of Chester v. Pennsylvania State Civil Service Comm'n,* 730 A.2d 935, 945-46 (Pa. 1999) (citations omitted; emphasis added). Accordingly, the Court may not interpret the word "person" to exclude the Commonwealth under the liability provisions of the UTPCPL and then interpret it to include the Commonwealth under the restoration provision of the same statute. Notably, the Supreme Court in *Meyer II* did not limit its definition of the word "person" to a particular section of the UTPCPL, and, in fact, the Court's language implies broad application of the definition:

> **the UTPCPL** is ambiguous as to whether political subdivision agencies constitute 'persons.' However, based on our consideration of the law prior to the **UTPCPL**'s enactment, the **UTPCPL's purpose**, and the consequences of a holding that it applies to such agencies, **we** conclude the **legislature did not intend for the definition of 'person'** to include political subdivision agencies.

*Meyer II*, 93 A.3d at 815 (emphasis added).

In *TAP*, the Commonwealth challenged pharmaceutical companies' prescription drug pricing claiming that the defendant companies engaged in deceptive practices. Among the claims advanced by the Commonwealth were multiple UTPCPL violations. This Court ultimately found that one of the *TAP* defendants violated the UTPCPL and, *inter alia*, awarded restoration under Section 4.1 of the UTPCPL. On review, the Supreme Court vacated this Court's order and remanded the matter because the Commonwealth had not properly accounted for prescription drug rebates. The Supreme Court did not address whether the Commonwealth was entitled to restoration under the UTPCPL as a "person in interest." 73 P.S. § 201-4.1. Therefore, there is no binding Pennsylvania authority directly addressing whether the Commonwealth is a "person" in interest entitled to restoration under the UTPCPL.

However, the United States District Court for the Southern District of New York addressed this very issue in *In re: Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, (S.D.N.Y. Master File No. 1:00-1898, MDL 1358 (SAS), M21-88, filed July 2, 2015), 2015 U.S. Dist. LEXIS 88035, 2015 WL 4092326. Therein, the District Court considered a similar Commonwealth argument, reviewed the relevant case law, and explained:

> The Commonwealth's entitlement to restoration under the UTPCPL turns on whether it qualifies as a 'person' under the restoration provision of the statute. The Pennsylvania courts have not provided a clear answer to this question. In *Commonwealth v. TAP Pharmaceutical Products*, [36 A.3d 1112 (Pa. Cmwlth. 2011), *vacated and remanded*, 94 A.3d 350 (Pa. 2014),] the trial court analyzed the term 'person' and concluded that the Commonwealth was a public entity entitled to restoration under the statute. This decision was later vacated and remanded by the Pennsylvania Supreme Court because the Commonwealth failed at trial to provide a rational accounting of the relevant state agency's damages. The Pennsylvania Supreme Court did not, in remanding *TAP*, address the Commonwealth's entitlement to restoration as a 'person' under the statute.

32

The very day that it remanded *TAP*, the Pennsylvania Supreme Court issued a decision in [*Meyer II*], holding that 'political subdivision agencies' do not constitute 'persons' under the UTPCPL.  In *Meyer* [*II*], the court confronted the definition of 'person' under the UTPCPL in a slightly different context: whether a public entity was a 'person' that could be sued under the statute, not whether a public entity was a 'person' entitled to restoration.  Context aside, the statutory provision the *Meyer* [*II*] court interpreted — which defines 'person' under the UTPCPL — was the same one at issue in *TAP*.

The Commonwealth urges the Court to ascribe different meanings to the word 'person' across different sections of the UTPCPL, arguing principally that the Commonwealth's broad enforcement power under the statute militates in favor of an expansive definition of 'person' in the context of *recovering damages*, and a narrower definition of 'person' in deciding whether to hold a public entity *liable* under the statute.  For additional support, the Commonwealth juxtaposes [S]ection 4 of the [UTPCPL], which permits the Attorney General to 'bring an action in the name of the Commonwealth' to restrain violations of the statute, with the restoration provision — [S]ection 4.1 [of the UTPCPL] — which gives the court discretion to direct that defendants 'restore *any person in interest*' whenever a court 'issues a permanent injunction . . . *as authorized in* [*S*]*ection 4* [*of the UTPCPL*].'  [73 P.S. §§ 201-4, 4.1 (emphasis added)].  Reading these contiguous provisions of the statute together and accounting for its overall purpose of 'policing the marketplace and remedying unfair and deceptive conduct,' the Commonwealth concludes that restoration must be available to it as a remedy under the statute.

This is a fair interpretation — and perhaps a more appealing one from a policy perspective — but still remains at odds with the Pennsylvania Supreme Court's pronouncement in *Meyer* [*II*].  Further, as defendants point out, counting the Commonwealth as a '*person* in interest' would stretch the statutory definition beyond its plain meaning.  **It is even more troubling to give 'person' different meanings in different sections of the same statute, especially after the Pennsylvania Supreme Court recently defined the term without explicitly limiting its meaning.**  After considering

33

various statutory interpretation arguments, the *Meyer* [*II*] Court excluded the Commonwealth and its agencies as 'persons' under the UTPCPL and gave no indication that the result would or should be different in the enforcement context. A contrary ruling in this case would appear to defy *Meyer* [*II*] and do violence to the UTPCPL's statutory scheme.

*MTBE*, Slip Op. at 19-22, 2015 U.S. Dist. LEXIS 88035 at 21-23, 2015 WL 4092326 at 5-6 (emphasis added; footnotes omitted). Accordingly, the District Court concluded that the Commonwealth was prohibited from seeking restoration under the UTPCPL. We find the District Court's analysis compelling and, for the reasons stated therein, similarly conclude that the Commonwealth may not seek restoration under the UTPCPL in this case.[23] Thus, Golden Gate's Preliminary Objection 10 is sustained.

## III. Breach of Contract – Preliminary Objection 9[24]

Golden Gate argues that the Commonwealth's common law contract claim should be stricken from the Amended Complaint and dismissed with prejudice because the Department of Human Services'[25] (DHS) Nursing Facility Provider

---

[23] Notably, the District Court acknowledged its difficulty reconciling the *TAP* and *Meyer II* decisions:

> [T]his issue is an important one that the Pennsylvania Supreme Court should squarely address. Only adding to the confusion of the conflict in authorities is the [C]ourt's decision to remand *TAP* on unrelated grounds on the same day it issued *Meyer* [*II*], without any mention in *TAP* of the overlapping issue at the heart of *Meyer* [*II*]. The upshot is two rulings, issued on the same day, that may contradict each other.

*MTBE*, Slip. Op. at 22, 2015 U.S. Dist. Lexis 88035 at 23, 2015 WL 4092326 at 6 (footnote omitted).

[24] Preliminary Objection 9 – Demurrer - the Amended Complaint fails to state a viable breach of contract claim.

[25] Effective November 24, 2014, the Department of Public Welfare was officially renamed the Department of Human Services.

Agreements (Provider Agreements) are not contracts, as the Provider Agreements do not require any consideration to be paid to providers. Further, DHS has taken the position that Provider Agreements "represent nothing more than enrollment forms" and are "not contractual in character." *Dep't of Pub. Welfare v. Presbyterian Med. Ctr. of Oakmont*, 877 A.2d 419, 427 (Pa. 2005). The Commonwealth states in its brief that, after considering Golden Gate's arguments and authority, it would, with Golden Gate's concurrence, agree to withdraw its breach of contract claim (Count II). Under the circumstances, the Court considers Count II of the Commonwealth's Amended Complaint withdrawn and, thus, Preliminary Objection 9 is moot.

## IV. Unjust Enrichment - Preliminary Objections 3 and 11[26]

Golden Gate asserts in Preliminary Objection 3 that because the General Assembly has provided a statutory remedy, the Commonwealth's common law cause of action for unjust enrichment must be dismissed. The unjust enrichment claim allegedly arises from the Facilities' "submi[ssion of] billings to the Pennsylvania Medical Assistance [(MA)] Program." Amended Complaint at 160, ¶ 279.

Unjust enrichment is an equitable doctrine. *See Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526 (Pa. 2010). It "is the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, for which the beneficiary must make restitution. An action based on unjust enrichment is an action which sounds in quasi-

---

[26] Preliminary Objection 3 – Demurrer - the common law breach of contract and unjust enrichment claims are barred by Section 1504 of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1504.

Preliminary Objection 11 – Demurrer - if this Court finds that a contract existed between Golden Gate and the Commonwealth, the unjust enrichment claim should be stricken. Having accepted the Commonwealth's withdrawal of its breach of contract claim, we do not address Golden Gate's Preliminary Objection 11.

contract or contract implied in law." *Id*. at 531 n.7 (citation omitted). Our Supreme Court has

> consistently held that where a statutory remedy is provided, the procedure prescribed therein must be strictly pursued to the exclusion of other methods of redress. *Interstate Traveller Serv*[*s.*]*, Inc. v.* [] *Dep*[*'t*] *of Env*[*tl.*] *Res*[*.*]*, . . .* 406 A.2d 1020 ([Pa.] 1979); [] *Dept. of Env*[*tl.*] *Res*[*.*] *v. Wheeling-Pittsburgh Steel Corp., . . .* 375 A.2d 320 ([Pa.] 1977); *Erie Human Relations Comm*[*'n*] *ex rel. Dunson v. Erie Ins*[*.*] *Exch*[*.*]*, . . .* 348 A.2d 742 ([Pa.] 1975); *Borough of Green Tree v. B*[*d.*] *of Prop*[*.*] *Assessments, . . .* 328 A.2d 819 ([Pa.] 1974); *Colteryahn Sanitary Dairy v. Milk Control Comm*[*'n*]*, . . .* 1 A.2d 775 ([Pa.] 1938); *Ermine v. Frankel, . . .* 185 A. 269 ([Pa.] 1936); *Bowman v. Gum, Inc., . . .* 184 A. 258 ([Pa.] 1936); *White v. Old York R*[*d.*] *Country Club, . . .* 178 A. 3 ([Pa.] 1935); *Taylor v. Moore, . . .* 154 A. 799 ([Pa.] 1931); *Moore v. Taylor, . . .* 23 A. 768 ([Pa.] 1892).
>
> This theory is also embodied in our Statutory Construction Act [of 1972[27]] which states:
>
>> In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by any statute, the directions of the statute shall be strictly pursued, and *no penalty shall be inflicted, or anything done agreeably to the common law, in such cases, further than shall be necessary for carrying such statute into effect.*
>
> 1 Pa.C.S. § 1504 (emphasis added).

*Jackson v. Centennial Sch. Dist.*, 501 A.2d 218, 220 (Pa. 1985); *see also White v. Conestoga Title Ins. Co.*, 53 A.3d 720 (Pa. 2012). "[B]ut, where the legislature explicitly reveals in a statute that it does not intend for such exclusivity, a statutory procedure for dispute resolution does not preempt common law claims." *Id.* at 733. Further:

---

[27] 1 Pa. C.S. §§ 1501-1991.

36

When the Legislature has seen fit to enact a pervasive regulatory scheme and to establish a governmental agency possessing expertise and broad regulatory and remedial powers to administer that statutory scheme, a court should be reluctant to interfere in those matters and disputes which were intended by the Legislature to be considered, at least initially, by the administrative agency. Full utilization of the expertise derived from the development of various administrative bodies would be frustrated by indiscriminate judicial intrusions into matters within the various agencies' respective domains.

*Feingold v. Bell of Pa.*, 383 A.2d 791, 793 (Pa. 1977).

We therefore review relevant statutory and regulatory provisions to determine whether the Legislature has provided a statutory remedy to address the alleged overpayment for provider services and, further, whether it "enact[ed] a pervasive regulatory scheme and . . . establish[ed] a governmental agency possessing expertise and broad regulatory and remedial powers to administer [it.]" *Id.*

Section 206 of the Human Services Code (Code)[28] describes:

[DHS] shall have the power:

(1) Whenever the General Assembly shall have appropriated money to [DHS] for public welfare purposes, **to purchase necessary services for individuals entitled to such services at rates not exceeding those charged the general public or actual cost; such services may be purchased directly from agencies or institutions conforming to minimum standards established by [DHS] or by law or [DHS] may reimburse local public agencies which purchase such services from such agencies or institutions.** Except for day care services, this clause shall not be interpreted to include the direct provision by [DHS] of services to dependent or neglected children.

(2) **To establish rules and regulations not inconsistent with law prescribing minimum standards of plant, equipment, service, administration and care and**

---

[28] Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §§ 101-1503. Effective December 28, 2015, the Public Welfare Code was renamed the Human Services Code. *See* 62 P.S. § 101.

**treatment for agencies and institutions furnishing service to individuals paid for, in whole or in part, by money appropriated to [DHS] by the General Assembly, and when not otherwise established by law, fixing per diem or other rates for services furnished by such agencies or institutions.**

62 P.S. § 206 (emphasis added). Section 403.1 of the Code[29] provides in relevant part:

(a) [**DHS**] **is authorized to establish rules, regulations, procedures and standards consistent with law as to the administration of programs providing assistance** . . . that do any of the following:

(1) Establish standards for determining eligibility and the nature and extent of assistance.

(2) Authorize providers to condition the delivery of care or services on the payment of applicable copayments.

(3) Modify existing benefits, establish benefit limits and exceptions to those limits, establish various benefit packages and offer different packages to different recipients, to meet the needs of the recipients.

(4) **Establish or revise provider payment rates or fee schedules, reimbursement models or payment methodologies for particular services.**

(5) Restrict or eliminate presumptive eligibility.

(6) **Establish provider qualifications.**

(b) [DHS] is authorized to develop and submit State plans, waivers or other proposals to the Federal Government and to take such other measures as may be necessary to render the Commonwealth eligible for available Federal funds or other assistance.

62 P.S. § 403.1 (emphasis added).

---

[29] Added by Section 2 of the Act of June 30, 2011, P.L. 89.

DHS's Regulations are contained in the Medical Assistance (MA) Manual (Manual).[30] The Manual "sets forth the MA regulations and policies which apply to providers." Section 1101.11(a) of the Manual, 55 Pa. Code § 1101.11(a). Section 1101.11(b) of the Manual provides that "[t]he MA Program is authorized under Article IV of the [Code] (62 P.S. §§ 401-488) and is administered in conformity with Title XIX of the Social Security Act (42 U.S.C. §§ 1396-1396[w-5]) and regulations issued under it." 55 Pa. Code § 1101.11(b).

> Section 1101.74 of the Manual provides:
>
> If, after investigation, [DHS] determines that a provider has submitted or has caused to be submitted claims for payments which the provider is not otherwise entitled to receive, [DHS] will, in addition to the administrative action described in [Sections] 1101.82-1101.84 [of the Manual] (relating to administrative procedures), refer the case record to the Medicaid Fraud Control Unit of the Department of Justice for further investigation and possible referral for prosecution under Federal, State and local laws. Providers who are convicted by a Federal court of willfully defrauding the Medicaid program are subject to a $25,000 fine or up to five years imprisonment or both.

55 Pa. Code § 1101.74. Further, Section 1101.75(a) of the Manual[31] enumerates provider prohibited acts which include submitting false or fraudulent claims. Section

---

[30] 55 Pa. Code §§ 1101.11-1251.81

[31] Section 1101.75(a) of the Manual states, in relevant part:

> An enrolled provider may not, either directly or indirectly, do any of the following acts:
>
> (1) Knowingly or intentionally present for allowance or payment a false or fraudulent claim or cost report for furnishing services or merchandise under MA, knowingly present for allowance or payment a claim or cost report for medically unnecessary services or merchandise under MA, or knowingly submit false information, for the purpose of obtaining greater compensation than that to which the provider is legally entitled for furnishing services or merchandise under MA.

1101.75(b) of the Manual also mandates that providers or other persons who violate its provisions are subject to criminal penalties, enforcement actions and restitution and repayment. *See* 55 Pa. Code § 1101.75(b).

Section 1101.83 of the Manual specifically provides for restitution and repayment as follows:

> (a) **If [DHS] determines that a provider has billed and been paid for a service or item for which payment should not have been made, it will review the provider's paid and unpaid invoices and compute the amount of the overpayment or improper payment. [DHS] will use statistical sampling methods and, where appropriate, purchase invoices and other records for the purpose of**

---

> (2) Knowingly submit false information to obtain authorization to furnish services or items under MA.
>
> . . . .
>
> (5) Submit a claim for services or items which were not rendered by the provider or were not rendered to a recipient.
>
> . . . .
>
> (8) Submit a claim which misrepresents the description of the services, supplies or equipment dispensed or provided, the date of service, the identity of the recipient or of the attending, prescribing, referring or actual provider.
>
> . . . .
>
> (12) Enter into an agreement, combination or conspiracy to obtain or aid another in obtaining payment from the Department for which the provider or other person is not entitled, that is, eligible.
>
> (13) Make a false statement in the application for enrollment or reenrollment in the program.
>
> (14) Commit a prohibited act specified in [Section] 1102.81(a) [of the Manual] (relating to prohibited acts of a shared health facility and providers practicing in the shared health facility).

55 Pa. Code § 1101.75(a).

40

**calculating the amount of restitution due for a service, item, product or drug substitution.**

(b) [DHS] may seek reimbursement from the ordering or prescribing provider for payments to another provider, if [DHS] determines that the ordering or prescribing provider has done either of the following:

(1) Prescribed excessive diagnostic services; or

(2) Ordered diagnostic services or treatment or both, without documenting the medical necessity for the service or treatment in the medical record of the MA recipient.

(c) **The amount of restitution demanded by [DHS] will be the amount of the overpayment received by the ordering or prescribing provider or the amount of payments to other providers for excessive or unnecessary services prescribed or ordered. If the ordering or prescribing provider is convicted of an offense under Article XIV of the [Code] (62 P.S. §§ 1401-1411), the restitution penalties of that article applies.**

(d) **The provider shall pay the amount of restitution owed to [DHS] either directly or by offset of valid invoices that have not yet been paid. The method of repayment is determined by [DHS]. All [DHS] demands for restitution will be approved by the Deputy Secretary for [MA] before the provider is notified.**

(e) **If [DHS] determines that a provider has committed any prohibited act or has failed to satisfy any requirement under [Section] 1101.75(a) [of the Manual] (relating to provider prohibited acts),** *it* **may institute a civil action against the provider in addition to terminating the provider's enrollment. If [*DHS*] institutes a civil action against the provider, [*DHS*] may seek to recover twice the amount of excess benefits or payments plus legal interest from the date the violations occurred.**

(f) The provider is prohibited from billing an eligible recipient for any amount for which the provider is required to make restitution to [DHS].

55 Pa. Code § 1101.83 (italic and bold emphasis added).[32]

Finally, Section 1187.1(c) of the Manual states: "The MA Program provides payment for nursing facility services provided to eligible recipients by enrolled nursing facilities. **Payment for services is made subject to** this chapter and **Chapter 1101** (relating to general provisions)." 55 Pa. Code § 1187.1(c) (emphasis added).

The Commonwealth admits that "[DHS] has promulgated comprehensive regulations to implement the [MA P]rogram [that] cover rate-setting . . . and include mechanisms both for punishing non-compliance . . . and for recovering overpayments to providers." Commonwealth's Br. at 40. Nevertheless, the Commonwealth contends that it is entitled to pursue its equitable unjust enrichment claim.

The instant matter is controlled by our Supreme Court's decision in *Commonwealth v. Glen Alden Corp.*, 210 A.2d 256 (Pa. 1965).[33] In *Glen Alden*, the Commonwealth filed an action in the trial court's equity jurisdiction seeking an order requiring the defendants to remove burning coal piles, asserting that the coal piles constituted a public nuisance. The trial court sustained the defendants' preliminary objections to the trial court's equity jurisdiction.

---

[32] The Commonwealth contends that there is no authority for a **regulation** to displace common law remedies. However, Sections 1101.75 and 1101.83 of the Manual substantially track Section 1407 of the Code, 62 P.S. § 1407, added by Section 3 of the Act of July 10, 1980, P.L. 493, which provides a comprehensive, detailed statutory procedure addressing fraudulent MA claims, providing criminal penalties therefor, and permitting DHS to pursue civil remedies. Further, Section 1410 of the Code states "[**DHS**] **shall have the power and its duty shall be to adopt rules and regulations** to carry out the provisions of this article." 62 P.S. § 1410 (added by Section 3 of the Act of July 10, 1980, P.L. 493) (emphasis added).

[33] In *Glen Alden*, the Air Pollution Control Act, Act of January 8, 1960, P.L. 2119, 35 P.S. §§ 4001-4015 was at issue. The Supreme Court's decision was superseded by the 1968 amendments to the Act, *see* Act of June 12, 1968, P.L. 163, 35 P.S. § 4012.1, *as recognized in Borough of Brookhaven v. American Rendering, Inc.*, 256 A.2d 626 (Pa. 1969).

On appeal, the Pennsylvania Supreme Court explained: "[W]e have frequently decided that equity has no jurisdiction to inquire into a controversy where to do so would obviate a statutory procedure provided by the Legislature for its resolution." *Id*. at 258. Finding that the Air Pollution Control Act set forth a specific procedure to address the very issue before the trial court in equity, the Court held that "equity may not inquire into the dispute, notwithstanding the fact that the complaint may state a cause of action in public nuisance, traditionally cognizable in equity." *Id*. The Court explained: "The Commonwealth, at the instance of the Secretary of Health, complains that the burning refuse piles maintained by defendants release noxious gases to the detriment of the health and well[-]being of the surrounding residents. The Air Pollution Control Act is designed to regulate this very problem." *Id*. The Court further stated: "[W]e do not hesitate to conclude that the Legislature has provided a statutory method for resolution of the alleged problem set forth in the Commonwealth's complaint, and therefore, it must be strictly pursued." *Id*. at 259. The Court concluded: "[W]e see no reason why [the Commonwealth] should be permitted to short circuit the method provided by the Legislature for resolving the present controversy." *Id*. at 260.

In the case at bar, the Commonwealth contends that the Parent Entities and GGNSC Equity Holdings LLC were unjustly enriched because the Facilities submitted billings to the MA Program for care they either did not provide, or was inadequately rendered. As in *Glen Alden*, a statutory remedy exists, and "we see no reason why [the Commonwealth] should be permitted to short circuit the method provided by the Legislature for resolving the present controversy." *Id*. at 260. Both the Code and the Manual set forth the manner in which MA billing disputes shall be remedied, and charges DHS with the responsibility of resolving the same. Because Section 1504 of the Statutory Construction Act of 1972 and the aforementioned case

law require those statutory remedies to be strictly pursued, we sustain Golden Gate's Preliminary Objection 3 and dismiss the Commonwealth's unjust enrichment claim.[34]

## V. Preliminary Objection 12

Golden Gate alleges in Preliminary Objection 12 that claims against the Parent Entities must fail because the Commonwealth has not alleged facts sufficient to pierce the corporate veil or impose vicarious liability.

Under Pennsylvania law, the existence and extent of shareholder liability for corporate indebtedness is determined by the law of the state of incorporation. *Broderick v. Stephano*, 171 A. 582 (Pa. 1934). The Parent Entities and the Facilities were incorporated in Delaware. Therefore, in evaluating whether the Commonwealth has alleged sufficient facts to pierce Golden Gate's corporate veil, we must apply Delaware law.

> The Delaware Court of Chancery has explained:
>
> In order to state a cognizable claim to pierce the corporate veil of the [g]eneral [p]artner, plaintiffs must allege facts that, if taken as true, demonstrate the [o]fficers' and/or the [p]arents' **complete** **domination and control** of the [g]eneral [p]artner. **The degree of control required to pierce the veil is exclusive domination and control** . . . to the point that [the [g]eneral [p]artner] **no longer has legal or independent significance of [its] own.**
>
> Piercing the corporate veil under the alter ego theory **requires that the *corporate structure* cause fraud or similar injustice**.[35] Effectively, the corporation must be a sham and **exist for no other purpose than as a vehicle for fraud**.

---

[34] Having dismissed the Commonwealth's unjust enrichment claim, we need not address Golden Gate's other related arguments.

[35] The term "'[s]imilar injustice' includes the contravention of law or contract." *Nufarm v. RAM Research* (Del. Ch., C.A. No. 16179, filed Sept. 15, 1998), Ltr. Op. at __.

*Wallace v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (italic and bold emphasis added; footnotes and quotation marks omitted); *see also Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del. Super. 1996). Accordingly, "[t]o state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003). Notably, "the fraud or similar injustice that must be demonstrated in order to pierce a corporate veil under Delaware law must, in particular, 'be found in the defendants' **use of the *corporate form*.**" *Foxmeyer Corp. v. Gen. Elec. Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003) (italic and bold emphasis added) (quoting *Mobil Oil Corp. v. Linear Fims, Inc.,* 718 F.Supp. 260, 269 (D. Del 1989)).[36]

---

[36] Under Pennsylvania law:

> Piercing the corporate veil is an extraordinary remedy reserved for cases involving exceptional circumstances. There is a strong presumption against piercing the corporate veil, and the independence of separate corporate entities is presumed.

> The purpose of the doctrine of piercing the corporate veil is to assess liability for the acts of a corporation to the equity holders in the corporation by removing the statutory protection otherwise insulating a shareholder from liability. Where a corporation operates as a mere façade for the operations of a dominant shareholder, the dominating shareholder may be held liable for the corporation's inequitable conduct perpetrated through the use of the corporate form's protections.

> While there is no bright-line test for when to pierce the corporate veil, courts established the following list of factors for consideration: '[1] [u]ndercapitalization, [2] failure to adhere to the corporate formalities, [3] substantial intermingling of corporate and personal affairs and [4] use of the corporate form to perpetrate a fraud.' *Lumax Indus., Inc.* [*v. Aultman*], . . . 669 A.2d [893,] 895 [(Pa. 1995)] (citing *Dep't of Envtl. Res. v. Reggs Run Coal Co.*, . . . 423 A.2d 765, 768-69 ([Pa. Cmwlth.] 1980)).

The Commonwealth alleges numerous facts in the Amended Complaint supporting its assertion that the Parent Entities controlled the Facilities, and that the Parent Entities siphoned monies from the Facilities.[37] The Commonwealth contends that GGNSC Holdings LLC directly or indirectly owns each of the Parent Entities and each of the Facilities, and that GGNSC Holdings LLC "exercises pervasive, day-to-day control over the operations of the [Facilities] through the actions of . . . the other [Parent Entities]." Amended Complaint at 150, ¶ 253. Further, the Commonwealth in its Amended Complaint describes the corporate structure as follows:

> [T]he relationship between each of the [Facilities] and Golden Gate National Senior Care LLC, GGNSC Clinical Services LLC, and Golden Ventures is not a typical arm's length relationship, in which one business contracts with another to provide services at its direction. On information and belief, the [Facilities] do not provide direction to or exercise any measure of control over Golden Gate National Senior Care LLC, GGNSC Clinical Services LLC, or Golden Ventures, nor do the [Facilities] direct the services that these entities provide to them. Rather, these [Parent

*Newcrete Prods. v. City of Wilkes-Barre*, 37 A.3d 7, 12-13 (Pa. Cmwlth. 2012) (citations omitted).

Importantly, "[t]he corporate form will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime." *Mosaica Educ., Inc. v. Pa. Prevailing Wage Appeals Bd.*, 925 A.2d 176, 184 (Pa. Cmwlth. 2007). Further:

> Any inquiry involving corporate veil-piercing must 'start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception.' *Wedner v. Unemployment Comp*[.] *Bd. of Review*, . . . , 296 A.2d 792, 794 ([Pa.] 1972). **One 'exception' is the alter ego theory which requires proof (1) that the party exercised domination and control over [the] corporation; and (2) that injustice will result if [the] corporate fiction is maintained despite unity of interests between [the] corporation and its principal.**

*Allegheny Energy Supply Co., LLC v. Wolf Run Mining Co.*, 53 A.3d 53, 58 n.7 (Pa. Super. 2012) (emphasis added).

[37] Importantly, "[t]he Commonwealth has not alleged (and is not suggesting) that the [Facilities] are deeply in debt or insolvent[.]" Commonwealth's Br. at 54.

Entities] exercise pervasive day-to-day control over the [Facilities] - at the direction of the ultimate parent company, [GGNSC Holdings LLC]. The [Facilities] are then, in turn, required to pay each of these [Parent Entities] for these services.

Amended Complaint at 152, ¶ 257. The Commonwealth further avers:

The [Parent Entities] exercise control over the [Facilities] by, for example:

(a) Restricting the ability of the [Facilities'] managers to increase staffing levels;

(b) Supervising - and in some cases, overriding - the personnel decisions of the [Facilities];

(c) Visiting facilities, observing care, and enforcing corporate-level policies;

(d) Preparing and submitting requests for reimbursement and required cost reports under the [MA] Program in Pennsylvania;

(e) Creating and implementing company-wide policies and incentive programs;

(f) Requiring centralized reporting of key data points - such as daily reporting of census information - from the [Facilities] to the [Parent Entities];

(g) Maintaining a company-wide Customer Compliance Hotline for residents to call if they have raised a concern with [Facilities] staff but still feel that their concern has not been addressed to their satisfaction.

Amended Complaint at 152-53, ¶ 258.

Clearly absent from the Amended Complaint, however, are allegations that Golden Gate "**use**[**d**] **. . . the** *corporate form*" **to engage in** "**fraud or similar injustice**[.]" *Foxmeyer*, 290 B.R. at 236 (emphasis added). Thus, the Commonwealth did not allege that the Parent Entities used the particular nature of Golden Gate's corporate structure to engage in "fraud or similar injustice." *Id.* Nor

did the Commonwealth allege in its Amended Complaint facts sufficient to support a conclusion that "[Golden Gate] [is] a sham and exist[s] for **no other purpose** than as a vehicle for fraud." *Id.* (emphasis added).[38] Accordingly, Golden Gate's Preliminary Objection 12 is sustained.[39]

## Conclusion

Based on the foregoing, Preliminary Objections 1, 2, and 7 are overruled. Preliminary Objections 3, 4, 5, 6, 8, 10, 11 and 12 are sustained.[40]

Given our disposition of the Preliminary Objections, for all of the above reasons, the Amended Complaint is dismissed.

_____
ANNE E. COVEY, Judge

---

[38] In the Amended Complaint, the Commonwealth alleges that the various Facilities "own[] and operate[] skilled nursing facilit[ies.]" Amended Complaint at 11-20, ¶¶ 27-76. As such, these allegations conflict with the premise that the Facilities are "sham[s] and exist for **no other purpose** than as a vehicle for fraud." *Wallace*, 752 A.2d at 1184 (emphasis added).

[39] We also reject the Commonwealth's assertion that the Parent Entities are vicariously liable for the acts of the Facilities, given that the argument seeks to disregard the corporate form without meeting the requirements for piercing the corporate veil.

[40] For the reasons stated herein, Preliminary Objection 9 is moot.

48

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania : 
Acting by Attorney General, : 
Kathleen Kane, : 
                Plaintiff : 
  : 
        v. : 
  : 
Golden Gate National Senior Care LLC; : 
GGNSC Holdings LLC; GGNSC : 
Administrative Services LLC; GGNSC : 
Clinical Services LLC; GGNSC Equity : 
Holdings LLC; GGNSC Harrisburg LP; : 
GGNSC Harrisburg GP, LLC; GGNSC : 
Camp Hill III LP; GGNSC Camp Hill : 
III GP, LLC; GGNSC Clarion LP; : 
GGNSC Clarion GP, LLC; GGNSC : 
Gettysburg LP; GGNSC Gettysburg GP, : 
LLC; GGNSC Altoona Hillview LP; : 
GGNSC Altoona Hillview GP, LLC; : 
GGNSC Lansdale LP; GGNSC : 
Lansdale GP, LLC; GGNSC : 
Monroeville LP; GGNSC Monroeville : 
GP, LLC; GGNSC Mt. Lebanon LP; : 
GGNSC Mt. Lebanon GP, LLC; : 
GGNSC Phoenixville II LP; GGNSC : 
Phoenixville II GP, LLC; GGNSC : 
Philadelphia LP; GGNSC Philadelphia : 
GP, LLC; GGNSC Wilkes-Barre II LP; : 
GGNSC Wilkes-Barre II GP, LLC; : 
GGNSC Tunkhannock LP; GGNSC : 
Tunkhannock GP, LLC; GGNSC : 
Erie Western Reserve LP; GGNSC : 
Erie Western Reserve GP, LLC; : 
GGNSC Pottsville LP; GGNSC : 
Pottsville GP, LLC, :   No. 336 M.D. 2015
             Defendants : 

## O R D E R

AND NOW, this 22nd day of March, 2017, we dispose of Defendants Golden Gate National Senior Care, LLC, *et al.*'s Preliminary Objections as follows:

Preliminary Objection 1: Overruled.

Preliminary Objection 2: Overruled.

Preliminary Objection 3: Sustained.

Preliminary Objection 4: Sustained.

Preliminary Objection 5: Sustained.

Preliminary Objection 6: Sustained.

Preliminary Objection 7: Overruled.

Preliminary Objection 8: Sustained.

Preliminary Objection 9: Moot.

Preliminary Objection 10: Sustained.

Preliminary Objection 11: Sustained.

Preliminary Objection 12: Sustained.

Based on the disposition of the Preliminary Objections, the Amended Complaint is hereby dismissed.

_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania     :
Acting by Attorney General,     :
Kathleen Kane,     :
               Plaintiff     :
    :
             v.     :    No. 336 M.D. 2015
    :    Argued: June 8, 2016
    :
Golden Gate National Senior Care     :
LLC; GGNSC Holdings LLC;     :
GGNSC Administrative Services     :
LLC; GGNSC Clinical Services     :
LLC; GGNSC Equity Holdings LLC;     :
GGNSC Harrisburg LP; GGNSC     :
Harrisburg GP, LLC; GGNSC Camp     :
Hill III LP; GGNSC Camp Hill III     :
GP, LLC; GGNSC Clarion LP;     :
GGNSC Clarion GP, LLC; GGNSC     :
Gettysburg LP; GGNSC Gettysburg     :
GP, LLC; GGNSC Altoona Hillview     :
LP; GGNSC Altoona Hillview GP,     :
LLC; GGNSC Lansdale LP; GGNSC     :
Lansdale GP, LLC; GGNSC     :
Monroeville LP; GGNSC     :
Monroeville GP, LLC; GGNSC Mt.     :
Lebanon LP; GGNSC Mt. Lebanon     :
GP, LLC; GGNSC Phoenixville II     :
LP; GGNSC Phoenixville II GP,     :
LLC; GGNSC Philadelphia LP;     :
GGNSC Philadelphia GP, LLC;     :
GGNSC Wilkes-Barre II LP;     :
GGNSC Wilkes-Barre II GP, LLC;     :
GGNSC Tunkhannock LP; GGNSC     :
Tunkhannock GP, LLC; GGNSC     :
Erie Western Reserve LP; GGNSC     :
Erie Western Reserve GP, LLC;     :
GGNSC Pottsville LP; GGNSC     :
Pottsville GP, LLC,     :
               Defendants     :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge

**CONCURRING AND DISSENTING OPINION**
**BY JUDGE COHN JUBELIRER**                    **FILED:  March 22, 2017**

I, respectfully, cannot completely agree with the thoughtful Majority opinion and therefore write separately.

I concur with the Majority's decision insofar as it holds that the Commonwealth has not stated claims under Sections 2(4)(v), 2(4)(ix), and 2(4)(x) of the Unfair Trade Practices and Consumer Protection Law (UTPCPL),[1] because the representations in the advertising materials are puffery. I also agree that the care plans, resident assessments, and bills are not advertising and are, therefore, not actionable under the above provisions. However, Section 2(4)(xxi) of the UTPCPL differs from the other provisions relied upon by the Commonwealth as Section 2(4)(xxi) establishes a cause of action to remedy "any . . . fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 P.S. § 201-2(4)(xxi).  There is no requirement under this "catch all" provision that the representation be made in an advertisement.

By addressing Section 2(4)(xxi) separately from Sections 2(4)(v), 2(4)(ix), and 2(4)(x), the Majority recognizes this distinction. However, the Majority, *sua sponte*, raises and then sustains a preliminary objection on the basis that the

---

[1] Act of December 17, 1968, P.L. 1224, <u>as amended</u>, 73 P.S. §§ 201-2(4)(v), (ix), (x).

Commonwealth did not attach a copy of the writings that underlie the cause of action. Commonwealth v. Golden Gate National Senior Care LLC, __ A.3d __, __ (Pa. Cmwlth., No. 336 M.D. 2015, filed March 22, 2017), slip op. at 23. Golden Gate National Senior Care LLC (Golden Gate) did not raise this as a basis for its preliminary objections, see Rule 1032(a) of the Pennsylvania Rules of Civil Procedure, Pa. R.C.P. No. 1032(a) (a "party waives all . . . objections which are not presented . . . by preliminary objection"), and it is not jurisdictional. Because the Court addressed an objection not raised by Golden Gate, the Commonwealth could not respond by either amending its pleading or explaining why the writings could not be attached. See Pa. R.C.P. No. 1028(c)(1) ("A party may file an amended pleading as of course within twenty days after service of a copy of preliminary objections"); Pa. R.C.P. No. 1019(i) ("[w]hen any claim or defense is based upon a writing, the pleader shall attach a copy of the writing, or the material part thereof, *but if the writing or copy is not accessible to the pleader, it is sufficient so to state, together with the reason, and to set forth the substance in writing*" (emphasis added)). I note that the writings at issue could contain confidential medical information. See 42 U.S.C. § 1396r(c)(1)(A)(iii) (Providing residents of skilled nursing facilities who receive medical assistance through Medicaid with "[t]he right to privacy with regard to accommodations, medical treatment, written and telephonic communications, visits, and meetings of family and of resident groups"). I would therefore not dismiss this claim, pursuant to Section 2(4)(xxi) of the UTPCPL, insofar as it alleges deceptive conduct involving bills and care plans which could directly impact purchasing decisions.[2]

---

[2] I recognize that care plans are created after a resident arrives at a nursing care facility. However, the relationship between residents, and their representatives, and the facilities are **(Footnote continued on next page…)**

I also question the Majority's decision to sustain Golden Gate's Preliminary Objection X, alleging that the Commonwealth may not recover restitution or restoration for itself under Section 4.1 of the UTPCPL, 73 P.S. § 201-4.1. Because the Majority has already dismissed the underlying substantive claims, there is no need to decide whether the Commonwealth is a "person in interest" entitled to restitution or restoration under Section 4.1 of the UTPCPL, and therefore the question is moot and the discussion merely dicta. I do not believe the Court should address a complex issue of first impression in dicta.[3]  This is particularly true where, as here, the resolution of the issue is subject to differences of opinion. I am not convinced that the Supreme Court's determination in <u>Meyer v. Community College of Beaver County</u>, 93 A.3d 806 (Pa. 2014) (<u>Meyer II</u>), that the UTPCPL

_____

**(continued…)**
ongoing, and the services are arguably continually purchased. In addition, care plans are amended as needs change. Therefore, I cannot say at this early stage, that the allegations here could not affect whether residents and/or their representatives can make informed decisions regarding whether to continue to purchase services from a particular facility. <u>See, e.g.</u>, the federal Resident's Bill of Rights, 42 U.S.C. §§ 1395i-3(c), 1396r(c), and associated regulations, which require that residents who receive assistance through Medicare or Medicaid be given care plans and be provided with the opportunity to be involved in the crafting of and amending of such plans; 42 U.S.C. § 1395i-3(c)(1)(A)(i) (providing for "[t]he right [of Medicare recipients] to . . . be fully informed in advance about care and treatment, to be fully informed in advance of any changes in care or treatment that may affect the resident's well-being, and (except with respect to a resident adjudged incompetent) to participate in planning care and treatment or changes in care and treatment"); 42 U.S.C. § 1396r(c)(1)(A)(i) (providing the same for those residents that receive assistance through medical assistance programs administered by states (Medicaid)); <u>see also</u> 42 C.F.R. § 483.10 (detailing the rights of residents in long term care facilities); 42 U.S.C. §§ 1395i-3(c)(1)(B)(iii), 1396r(c)(1)(B)(iv) (providing for the right to be informed "periodically during the resident's stay, of services available in the facility and of related charges for such services").

[3] The same principle applies to the Majority's decision to address Golden Gate's Preliminary Objection XII. There is no need for the Majority to hold that the Commonwealth cannot pierce the corporate veil when the Majority already dismissed all the substantive claims asserted.

does not include a political subdivision or agency in its definition of "a 'person' subject to *liability*" would necessarily mean that the Attorney General could not be a "person in interest" here, in bringing a cause of action under Section 4.1. I agree with the Majority that "[w]hen the meaning of a word or phrase *is clear* when used in one section, it will be construed to mean the same thing in another section of the same statute." Housing Auth. of Cnty. of Chester v Pa. State Civil Serv. Comm'n, 730 A.2d 935, 945-46 (Pa. 1999) (emphasis added). However, the Supreme Court has found that the UTPCPL is *not clear*, but is *ambiguous* as to the meaning of the word "person." Meyer II, 93 A.3d at 814. In Meyer II, the Supreme Court applied the principles of statutory construction to that ambiguous term and reasoned that the General Assembly could not have intended to include political subdivisions as a *person subject to liability* because imposing liability would violate the long-standing principle that government entities are not subject to punitive damages, and because the purpose of the statute is to protect consumers from merchants, not from the government. Id. at 814-15. That reasoning is not applicable here because no liability will be imposed upon a government entity; instead, the Commonwealth is seeking restitution and restoration from Golden Gate, a merchant, for money the Commonwealth paid as a result of the alleged deception. Given that the Supreme Court has found the term "person" ambiguous as used in the UTPCPL, an interpretation that the Commonwealth can be a "person of interest" in the restoration provision is permissible and consistent with our mandate to construe the terms of the UTPCPL "liberally to effect its object of preventing unfair or deceptive practices." Com., by Creamer v. Monumental Props., Inc., 329 A.2d 812, 817 (Pa. 1974).[4]

---

[4] I believe that this relief could nonetheless be available under Section 4 of the UTPCPL,
**(Footnote continued on next page…)**

For the foregoing reasons, I respectfully dissent to the Majority's decision to dismiss the Commonwealth's claim under Section 2(4)(xxi) of the UTPCPL on the basis of an objection that was not raised by Golden Gate but raised *sua sponte* by this Court. I also disagree that the Court should address a complex and significant issue of first impression in dicta and question the Majority's resolution of that issue. In all other areas, I concur.

_____
**RENÉE COHN JUBELIRER,** Judge

_____
**(continued…)**
73 P.S. § 201-4, if the Commonwealth can prove a claim under Section 2(4)(xxi). Section 4 provides the Attorney General with the authority to seek injunctive relief if it has reason to believe that any person has violated the substantive provisions of the UTPCPL. In interpreting a similar provision of the Federal Trade Commission Act (FTC Act), 15 U.S.C. §§ 41-58, as amended, federal courts have uniformly held that because the FTC Act provides the government with the authority to seek injunctive relief, the panoply of equitable power are also available to the courts to deprive a defendant of unjust gains. I note that we may look to federal decisions under the FTC Act for guidance in interpreting similar provisions in the UTPCPL. Com., by Creamer v. Monumental Props., Inc., 329 A.2d 812, 818 (Pa. 1974). The Attorney General under the UTPCPL sits in the same position as the FTC sits under the FTC Act. See e.g., Fed. Trade Comm'n v. Commerce Planet, Inc., 815 F.3d 593, 599 (9th Cir. 2016), cert. denied sub nom. Gugliuzza v. Fed. Trade Comm'n, 137 S. Ct. 624 (2017), and cert. denied sub nom. Gugliuzza v. Fed. Trade Comm'n, 137 S. Ct. 624 (2017) (concluding "[t]he equitable jurisdiction to enjoin future violations of § 5(a) [of the FTC Act, 15 U.S.C. § 53(b)] carries with it the inherent power to deprive defendants of their unjust gains from past violations"); Fed. Trade Comm'n v. Mylan Labs., Inc., 62 F. Supp. 2d 25, 37 (D.D.C.), on reconsideration in part sub nom. Fed. Trade Comm'n v. Mylan Labs., Inc., 99 F. Supp. 2d 1 (D.D.C. 1999) (holding that the FTC may seek disgorgement or any other form of equitable ancillary relief once an injunction is issued under Section 13(b) of the FTC Act); Fed. Trade Comm'n v. Sec. Rare Coin & Bullion Corp., 931 F.2d 1312, 1316 (8th Cir. 1991) ("The [trial court] has broad remedial discretion to grant an appropriate form of equitable relief under section 13(b) of the [FTC] Act").

RCJ-5